UNITED STATES of America,
Plaintiff–Appellee,

v.

James HASSAN EL, Defendant–
Appellant.

No. 92–5427.

United States Court of Appeals,
Fourth Circuit.

Argued May 7, 1993.

Decided Sept. 13, 1993.

---

Beth Mina Farber, Asst. Federal Public Defender, Federal Public Defender's Office, Baltimore, MD, argued (James K. Bredar, Federal Public Defender, of counsel), for defendant-appellant.

Barbara Slaymaker Sale, Asst. U.S. Atty., Baltimore, MD, argued (Richard D. Bennett, U.S. Atty., Barbara S. Skalla, Asst. U.S. Atty., of counsel), for plaintiff-appellee.

Before ERVIN, Chief Judge, and PHILLIPS and MURNAGHAN, Circuit Judges.

## OPINION

MURNAGHAN, Circuit Judge:

The defendant, James Hassan El, was found guilty by a jury of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g).[1] He was sentenced to 188 months imprisonment and three years supervised release. On appeal, Hassan El challenges both his conviction and sentence. He argues that the handgun introduced against him at trial should have been suppressed because it was seized as a result of a "pretextual stop" in violation of his Fourth Amendment rights. He also contends that the district court abused its discretion and violated his constitutional rights to present a defense and to confront hostile witnesses when it issued a pre-trial ruling restricting the scope of the evidence to be introduced at trial to primarily the events of the search and the seizure of the handgun. Finally, Hassan El also asserts that the district court erred in using his common law assault conviction for the purposes of calculating his sentence under the armed career criminal enhancement provisions of 18 U.S.C. § 924(e).

### I

According to the testimony offered at trial and at Hassan El's suppression hearing, on July 22, 1991, Baltimore City Police Officers James Rood, Kenneth Stanton, John Fabula, and Beryl Tuller were on patrol in a high crime area of West Baltimore City. All of the officers were in plain clothes. Officers Stanton and Rood, however, were driving in a marked police car, while Officers Fabula and Tuller followed them in an unmarked car. All four officers worked in the Operation Flex Unit. The flex unit investigates primarily narcotics and firearm offenses as well as burglaries, street robberies, and stolen automobiles.

At approximately 7:00 p.m., the officers in the marked car turned on their flashing lights and pulled over the Volkswagen Jetta in which Hassan El was riding. The unmarked police car pulled up in front of the vehicle and blocked any possible escape. The officers in the marked car testified that the Jetta had failed to stop at the stop sign marking the intersection of Glenolden Street and Edmondson Avenue. Officer Rood also stated that although he decided to stop the Jetta, he did not intend to give the driver a ticket and, in fact, did not have ticket books with him. Instead, he merely intended to warn the driver of his traffic violation. The officers in the unmarked vehicle testified that they did not know why the Jetta had been stopped but that they merely were performing their back-up duties by following the lead car to the side of the road.

Hassan El was seated in the front passenger seat of the car. While Officer Rood informed the driver, Pierre Cole, that he had run a stop sign and asked for his license and registration, his partner for the evening, Officer Stanton, went to the rear of the car to observe the passenger in the back seat. At the same time, Officer Fabula from the unmarked car approached Hassan El. He observed that Hassan El appeared nervous and, in the officer's words, somewhat uncomfortable. Officer Fabula further noticed a bulge in the center of Hassan El's waistband and asked him directly if he had a gun. At that point, according to the officer's testimony, Hassan El grew increasingly nervous. He also appeared to be moving his hands up his thighs towards the bulge. The officer then grabbed at the bulge through the open window and immediately felt a handgun. He screamed to Hassan El not to move his hands, opened the car door, and removed from the waistband a loaded .38 caliber revolver.

Officer Fabula quickly announced to the other officers that he had "one with a gun." After Hassan El was removed from the car, a further search uncovered a black nylon holster. Hassan El admitted to the police that he did not have a handgun permit and was placed under arrest. At some point after his arrest, Hassan El also spontaneously told the police that he had just bought the gun and was catching a "hack," a street term for a

---

**1.** Section 922(g)(1) states that it is unlawful "for any person ... who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year ... to ship or transport ... or possess ... any firearm or ammunition."

taxi or a ride. Neither the driver nor the other passenger was arrested.

Officer Stanton, who had been watching the rear passenger, testified that he did not actually see the removal of the handgun from Hassan El but did see him removed from the car. Officer Rood, who had been speaking to the driver, could not recall seeing Officer Fabula remove either the gun or the defendant. Officer Tuller, however, testified that he saw Officer Fabula remove the gun from Hassan El's waistband.

## II

■ Prior to trial, Hassan El filed motions to suppress the physical evidence and statements taken as a result of the stop of the Jetta. At the suppression hearing, the district court credited the testimony of the two police officers that the Jetta had gone through a stop sign. It concluded therefore that the officers were legally justified in stopping the car for committing a traffic violation. The district court further credited the testimony of Officer Fabula that he saw a bulge in the defendant's waistband, and it held the search and removal of the gun to be proper.

■ The primary issue on appeal is whether the district court erred in concluding that the officers were legally justified in stopping the Volkswagen Jetta. Because an ordinary traffic stop constitutes a limited seizure within the meaning of the Fourth and Fourteenth Amendments, *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1395, 59 L.Ed.2d 660 (1979), such action must be justified by probable cause or a reasonable suspicion, based on specific and articulable facts, of unlawful conduct. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Evidence seized as a result of an illegal stop is subject to the fruit of the poisonous tree doctrine. *See, e.g., Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Here, however, there was a specific and articulable fact: the traffic offense.

Hassan El argues that the police used the minor traffic violation—"if there was one"—as a pretext to conduct a stop of the Jetta and to search, without justification, for more serious criminal activity. Despite the trial court's decision to credit the officers' testimony concerning the Jetta's failure to stop at the stop sign, Hassan El maintains that the officers' testimony demonstrated that their true motivation for stopping the car was their unsubstantiated hunch that the passengers were involved in some sort of criminal activity or that the car had been stolen. Hassan El contends that such a "pretextual stop" violates the Fourth Amendment's prohibition against unreasonable searches and seizures. *See, e.g., United States v. Guzman*, 864 F.2d 1512, 1516 (10th Cir.1988) (defining a pretextual stop as an occasion on which "the police use a legal justification to make [a] stop in order to search a person or place, or to interrogate a person, for an unrelated serious crime for which they do not have the reasonable suspicion necessary to support a [legal] stop").

Hassan El urges us to adopt the test used by the Tenth and Eleventh Circuits for evaluating claims of pretextual stops.[2] In those circuits, an otherwise objectively lawful investigative stop will be deemed invalid if it represents a departure from routine police practices. " '[I]n determining when an investigatory stop is unreasonably pretextual, the proper inquiry ... is not whether the officer *could* validly have made the stop but whether under the same circumstances a reasonable officer *would* have made the stop in the absence of the invalid purpose.' " *United States v. Valdez*, 931 F.2d 1448, 1450 (11th Cir.1991) (quoting *United States v. Smith*, 799 F.2d 704, 709 (11th Cir.1986)); *accord United States v. Guzman*, 864 F.2d 1512, 1517 (10th Cir.1988) (applying the *Smith* test and noting that a stop is " 'unreasonable not because the officer secretly hope[s] to find evidence of a greater offense, but because it [i]s clear that an officer would have been uninterested in pursuing the lesser offense

---

**2.** The Fourth Circuit recently declined to determine the appropriate test for examining claims of pretextual stops. *See United States v. Rusher,* 966 F.2d 868, 876 (4th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 351, 121 L.Ed.2d 266 (1992).

absent that hope'" (quoting *Smith,* 799 F.2d at 710)).

Employing the test used by Tenth and Eleventh Circuits, Hassan El contends that, under the circumstances of the instant case, no reasonable officer on patrol would have followed and eventually stopped the Jetta for merely failing to stop at a stop sign. The four officers, he notes, were specifically assigned to investigate narcotics offenses, stolen vehicles, and firearms violations. Furthermore, they did not carry ticket books, and Officer Rood conceded that he did not intend to give the driver a ticket. Hassan El concludes therefore that the pretextual stop tainted the search and seizure process and required the suppression of the handgun.[3]

Regardless of the subjective motivations of the officers involved in the instant case, we conclude, in light of the district court's factual determinations, that the stop of the vehicle was justified and constitutional. Several circuits have considered claims of pretext and have adopted what is often referred to as a purely objective standard. The standard relies solely on the objective facts and circumstances surrounding the stop. *See United States v. Cummins,* 920 F.2d 498, 500–01 (8th Cir.1990), *cert. denied,* — U.S. —, 112 S.Ct. 428, 116 L.Ed.2d 448 (1991); *United States v. Mitchell,* 951 F.2d 1291 (D.C.Cir. 1991), *cert. denied,* — U.S. —, 112 S.Ct. 1976, 118 L.Ed.2d 576 (1992); *accord United States v. Trigg,* 878 F.2d 1037, 1039 (7th Cir.1989), *appeal after remand,* 925 F.2d 1064 (7th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 428, 116 L.Ed.2d 448 (1991) (examining claim of pretextual arrest); *United States v. Causey,* 834 F.2d 1179, 1182 (5th Cir.1987) (*en banc*) (considering pretextual arrest); *United States v. Hawkins,* 811 F.2d 210, 213 (3d Cir.) (considering issue of pretext in context of a traffic stop which was found to have been prompted by reasonable suspicion), *cert. denied,* 484 U.S. 833, 108 S.Ct. 110, 98 L.Ed.2d 69 (1987); *see also United States v. Rusher,* 966 F.2d 868, 876 (4th Cir.) (Luttig, J., concurring in pt., concurring in the judgment in pt., and dissenting

in pt.) (urging the adoption of an objective standard), *cert. denied,* — U.S. —, 113 S.Ct. 351, 121 L.Ed.2d 266 (1992). Under the objective test, if an officer has probable cause or a reasonable suspicion to stop a vehicle, there is no intrusion upon the Fourth Amendment. That is so regardless of the fact that the officer would not have made the stop but for some hunch or inarticulable suspicion of other criminal activity:

> When an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle. . . . [T]his otherwise valid stop does not become unreasonable merely because the officer has intuitive suspicions that the occupants of the car are engaged in some sort of criminal activity. . . . [T]hat stop remains valid even if the officer would have ignored the traffic violation but for his other suspicions.

*Cummins,* 920 F.2d at 500–01; *see also Trigg,* 878 F.2d at 1041 ("So long as the police are doing no more than they are legally permitted and objectively authorized to do, an arrest is constitutional." (citing *Causey,* 834 F.2d at 1184)). Such an approach minimizes inquiry into a police officer's state of mind.

We adopt the objective test and likewise hold that when an officer observes a traffic offense or other unlawful conduct, he or she is justified in stopping the vehicle under the Fourth Amendment. Such a limited detention does not become "unreasonable merely because the officer has intuitive suspicions that the occupants of the car are engaged in some sort of criminal activity." *Cummins,* 920 F.2d at 499–501 (noting that the officer testified he probably would not have stopped the car if the defendant and his passenger had not continued glancing at him and behaving suspiciously).

Although we share the concerns, expressed by the Tenth and Eleventh Circuits, of the arbitrary exercise of police powers, we conclude that the objective test presents the

---

**3.** In the event we were to find that there is insufficient evidence in the record to determine whether the officers were engaging in routine or departmental practice when they stopped the Jet-

ta, Hassan El requests in the alternative a remand to the district court for further proceedings.

most principled basis upon which to analyze the validity of investigative stops. We further conclude that the test is most in keeping with the repeated admonitions of the Supreme Court that Fourth Amendment violations turn "on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time ... and not on the officer's actual state of mind at the time the challenged action was taken." *Maryland v. Macon*, 472 U.S. 463, 470, 105 S.Ct. 2778, 2782, 86 L.Ed.2d 370 (1985) (quoting *Scott v. United States*, 436 U.S. 128, 136, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978)); *see United States v. Villamonte–Marquez*, 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983).

In the instant case, the district court credited the officers' testimony that the driver of the Jetta in fact failed to stop at the stop sign, and we do not find its conclusion to be clearly erroneous. Moving traffic violations very often are dangerous to the person stopped and to others as well. It is a proper police purpose not to appear to excuse them.

The objective circumstances therefore provided a reasonable basis for stopping the Jetta.

Our inquiry does not end with the lawfulness of the stop, however, for we must also consider the reasonableness of the officers' conduct in light of the circumstances following the initial stop. In particular, we must examine the validity under the Fourth Amendment of the search of Hassan El and the seizure of the handgun. Officer Fabula testified that Hassan El appeared nervous and that he saw Hassan El's hands moving toward a bulge in his waistband. Officer Fabula also spoke of his concern for his safety and that of his fellow officers. The district court credited the officer's story, and its finding is not clearly erroneous. Based on the officer's testimony of the critical events, we agree with the district court that the search of Hassan El and the removal of the gun clearly were proper. *See Terry v.*

*Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968) (limited search for a weapon permitted if the officer has a reasonable suspicion that the suspect is armed and dangerous and that a search is necessary to protect the safety of the officer and others [4]). Accordingly, the handgun should not have been suppressed.

### III

■ Hassan El also challenges the district court's pre-trial order restricting the scope of evidence to be permitted at trial. We review a district court's evidentiary ruling for an abuse of discretion. District courts are permitted to place reasonable limits on the presentation of evidence as well as on the scope of cross-examination. *See, e.g., United States v. Gravely*, 840 F.2d 1156, 1162–64 (4th Cir.1988).

■ The district court's pre-trial order restricted the parties to presenting evidence solely on the events relating directly to the search of the defendant and to the seizure of the gun as well as to the question of whether Hassan El had been convicted of a prior offense within the meaning of 18 U.S.C. § 922(g). Hassan El objected that the order restricted him from presenting evidence essential to his defense. In essence, his theory of the case was that the officers were compelled to lie about the circumstances of the stop and the seizure of the gun in order to cover up their Fourth Amendment violations and to avoid suppression of the evidence. Under Hassan El's version of the events, the officers illegally stopped the Jetta because they merely suspected the car contained drug dealers. Without any reasonable and legal justification, the police then searched both the passengers and the Jetta and ultimately found the gun inside the car. The officers, the defense continues, thus were forced to concoct the story that they saw a "bulge" and found a gun on Hassan El in

---

4. Hassan El's argument concerning the suppression of the evidence was dependent upon the success of his contention that the stop of the Jetta was pretextual and violative of the Fourth Amendment. He argued that the handgun should have been suppressed because its recovery was the direct result of the unlawful, pretextual stop. The illegal stop, in other words, tainted the search and seizure. However, we have rejected the argument based on pretext. The stop was proper.

order to cover up the illegality of the stop and the search.

Accordingly, in order to present its theory and to explain to the jury the officers' motivation to lie, the defense had expected to explore at trial Fourth Amendment law concerning automobile stops and searches, the events leading up to the stop, and, finally, the stop itself. The defense also had hoped to introduce expert testimony explaining Fourth Amendment law and demonstrating why, if Hassan El's version of the story were to be believed, the handgun would have been suppressed. The trial court, however, rejected requests to modify its pretrial order.

On appeal, Hassan El contends that the district court's order was unnecessarily restrictive and violative of his constitutional right to a meaningful opportunity to present a complete defense and to confront hostile witnesses. By restricting the scope of evidence, the court, he claims, infringed on his right to full and effective cross-examination and thereby took from the jury its right to judge the credibility of the officers. Further, the witness expert in Fourth Amendment law, Hassan El contends, would have provided the jury with the necessary understanding of the officers' motivation to lie. But that is no more than an alternative attempt to raise again the subjective state of mind argument which we have rejected.

After reviewing the record, we find, moreover, that despite the trial court's pre-trial ruling, it appears the order was not rigidly enforced. Hassan El was able to elicit the information key to his theory of the case and to cross-examine effectively the officers. We note that the officers were questioned on the law of search and seizure and the consequences of an illegal search. They were specifically asked, for example, under what circumstances they would be entitled to search occupants of a car that had been stopped merely for a traffic violation. The officers were further questioned about the

character of the neighborhood in which the events took place, why the car had been stopped, the events leading up to the search of Hassan El, and the search itself. The driver of the Jetta also was permitted to testify that he was forced out of the car and searched and that he committed no traffic violation justifying the officers' stop. In short, despite the court's ruling, Hassan El still was able to pursue his theory of the case, to educate the jury on search and seizure law, and to call sufficiently into question the motivations of the officers to testify in a particular fashion. Accordingly, there was no reversible error.

## IV

Finally, Hassan El challenges the district court's application of the armed career criminal enhancement provisions of 18 U.S.C. § 924(e). The government sought and received an enhancement of Hassan El's sentence pursuant to § 924(e)(1) which establishes a mandatory minimum sentence of 15 years without parole for any person who has violated 18 U.S.C. § 922(g) *and* who has had at least three prior convictions for a "violent felony" or "serious drug offense."[5] Section 924(e)(2)(B) defines a "violent felony" as, *inter alia*, "any crime punishable by imprisonment for a term exceeding one year." The term "crime punishable by imprisonment for a term exceeding one year" is further defined in 18 U.S.C. § 921(a)(20). *See, e.g., United States v. Clark*, 993 F.2d 402, 403 (4th Cir. 1993) (noting that § 924(e) incorporates by reference the definition contained in § 921(a)(20)); *United States v. Reedy*, 990 F.2d 167, 170 (4th Cir.1993) (same). Section 921(a)(20) provides in pertinent part that:

[t]he term "crime punishable by imprisonment for a term exceeding one year" does not include. . . .

(B) any State offense classified by the laws of the State as a misdemeanor and punish-

---

**5.** Section 924(e)(1) states in pertinent part:

In the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such

person shall be fined not more than $25,000 and imprisoned not less than fifteen years.

. . . .

At trial, Hassan El stipulated that he had been convicted in state court of a crime punishable by imprisonment for a term exceeding one year for the purposes of a § 922(g) conviction.

able by a term of imprisonment of two years or less.

What constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held. Any conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

The three prior convictions relied upon by the district court to sentence Hassan El as an armed career criminal were two 1988 convictions for possession of heroin with intent to distribute and one 1985 conviction for common law assault for which the defendant received a three-year suspended sentence. Hassan El contended below and maintains on his appeal that his conviction for assault cannot be used for enhancing his sentence under § 924(e) because (1) the conviction should be considered a "misdemeanor" under 18 U.S.C. § 921(a)(20)(B), and (2) the conviction falls within the "restoration of rights" exception of § 921(a)(20).

## A. Misdemeanor Exclusion

■ In 1985 Hassan El pleaded guilty to assault and was sentenced by the Circuit Court of Baltimore City to three years imprisonment, the execution of which was suspended, and was placed on three years supervised probation. Hassan El argues that his conviction should not be counted as a violent felony under § 924(e) because the state of Maryland classifies the crime as a misdemeanor and because he actually served no jail time for the conviction in light of the suspension.[6] The defendant urges the court to look to, in cases involving a Maryland conviction for simple assault, the actual time spent in prison to determine whether the

conviction is a felony within the firearm provisions. Under Hassan El's reasoning, his crime was "punishable by a term of imprisonment of two years or less" and should be excluded from consideration in accordance with § 921(a)(20)(B).

We disagree. Although under Maryland law the common law crime of assault is classified as a "misdemeanor," there is no statutory time limitation on the penalty that can be imposed for an assault conviction. Rather, punishment in Maryland for the common law misdemeanor of simple assault is limited only by the constitutional prohibition against cruel and unusual punishment. See, e.g., Gleaton v. State, 235 Md. 271, 277, 201 A.2d 353, 356 (1964); United States v. Schultheis, 486 F.2d 1331, 1332 (4th Cir.1973). Assault, then, clearly is punishable by more than two years imprisonment. Hassan El was so punishable. He, in fact, received a sentence of over two years imprisonment, although his three-year sentence was indeed then suspended. Therefore, under the plain language of § 921(a)(20)(B), Hassan El's 1985 conviction was not a "misdemeanor punishable by a term of imprisonment of two years or less."

## B. Restoration of Rights Exception

■ Section 921(a)(20) also excludes from the definition of a "crime punishable by imprisonment for a term exceeding one year" those convictions for which a defendant has had his or her civil rights and his or her firearm privileges restored. Hassan El contends that the exception provides another basis to exclude his assault conviction from consideration for sentencing under § 924(e). In short, he expresses the view that, despite his conviction for assault, he retained sufficient civil rights and firearm privileges to fall within the civil rights exemption of § 921(a)(20).

---

6. Hassan El remarks that in all of the states save Maryland there are statutory misdemeanor assault provisions providing for punishment of less than two years. Maryland's rather unique scheme provides instead for statutory *felonies* of assault with intent to murder, ravish, or rob. See Md.Ann.Code art. 27, § 12. In addition, the common law assault misdemeanor is amenable to a sentence of more than two years. According to Hassan El, Maryland's common law crime of simple assault essentially functions as and should be treated as, for the purposes of the federal firearms laws, the equivalent of statutory simple assault present in other jurisdictions.

When determining whether Hassan–El had his civil rights "restored" under Maryland law, we are required to look to "the whole of state law." *United States v. McLean,* 904 F.2d 216, 218 (4th Cir.), *cert. denied,* 498 U.S. 875, 111 S.Ct. 203, 112 L.Ed.2d 164 (1990). The term "civil rights" generally includes the right to vote, the right to hold public office, and the right to serve on a jury. *See United States v. Cassidy,* 899 F.2d 543, 549 (6th Cir.1990). The restoration of rights need not be complete to render a prior conviction unavailable for consideration under § 924(e); however, it seems clear that "Congress envisioned a restoration of more than a *de minimis* quantity of civil rights." *Id.*

Maryland, unlike many states, has no general restoration of rights statute for criminal offenders nor does it issue to felons who have completed their sentences certificates of discharge restoring their rights. There are instead specific statutory sections addressing various civil rights. Because common law simple assault is neither a felony nor an "infamous crime" under Maryland law, Hassan El did not lose his right to vote as a result of his assault conviction. *See* Md.Code Ann. art. 33, § 3–4(c); 67 Op.Att'y Gen. (Md.) 176, 191 (1982). However, Hassan El has lost his right to sit on a jury because of the 1985 assault conviction. *See* Md.Cts. & Jud.Proc.Code Ann. § 8–207(b). The loss of that right precludes a finding of a substantial restoration of civil rights necessary to satisfy § 921(a)(20). *See United States v. Metzger,* 3 F.3d 756 (4th Cir.1993); *see also United States v. Driscoll,* 970 F.2d 1472, 1479 (6th Cir.1992) (loss of right to serve on jury precludes a finding of restoration of rights), *cert. denied,* —— U.S. ——, 113 S.Ct. 1056, 122 L.Ed.2d 362 (1993).[7]

Accordingly, the judgment of the district court is

*AFFIRMED.*

---

7. Because we find no restoration of civil rights, we find it unnecessary to discuss whether the limitations on Hassan–El's firearm privileges also render the assault conviction available for consideration under § 924(e).