14 F.3d 597
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Michael Antonio GOODMAN, Defendant-Appellant.
 No. 93-5208.
United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 28, 1993.
Dec. 27, 1993.
 
 Appeal from the United States District Court for the Eastern District of North Carolina, at Elizabeth City.
 George Bullock Currin, for appellant.
 John Eric Evenson, II, Assistant United States Attorney, for appellee.
 David Keith Teague, for appellant.
 James R. Dedrick, United States Attorney, for appellee.
 E.D.N.C.
 AFFIRMED.
 Before ERVIN, Chief Judge, PHILLIPS, Circuit Judge, and MICHAEL, United States District Judge for the Western District of Virginia, sitting by designation.
 PHILLIPS, Circuit Judge:
 
 OPINION
 
 1
 Michael Antonio Goodman appeals his conviction on federal drug and firearm charges. We affirm.
 
 I.
 
 2
 Shortly after midnight on a Saturday night in early 1991, North Carolina State Highway Patrolman Samuel Armstead was on routine patrol near Ike's Place, a night spot in rural Gates County known to sell alcoholic beverages, when he saw two cars approaching from the direction of the night spot. He noticed that the lead car had a Virginia license plate on its front, and that both cars were driving well below the posted speed limit. After he passed the cars, he looked in his rear view mirror and saw the lead car cross the centerline. He immediately turned around and began to follow it to see if its driver exhibited further signs of driving under the influence. Just as he caught up with the two cars, the lead car made a left turn off the main road onto an unpaved rural road. Armstead followed and turned on his blue light. The car's driver immediately pulled over to the side of the road and stopped.
 
 
 3
 When Armstead approached the stopped car, he immediately recognized the driver as Goodman, whom he had arrested several times before for traffic offenses. He also saw another man seated in the front passenger seat. He asked for Goodman's license and registration. Goodman pulled the license out of his wallet, took the keys out of the ignition, and leaned over to unlock the glove compartment. As he did so, he turned his back to Armstead so that Armstead could not see what he was doing. Alarmed, Armstead repositioned himself so that he could better observe Goodman's movements. He noticed that when Goodman opened the glove compartment, he was careful to crack it open only a few inches--just enough for him to slip his fingers in and pull out a pink piece of paper. This aroused Armstead's suspicions further and led him to think that there was something in the glove compartment that Goodman did not want him to see. After retrieving the pink piece of paper, Goodman tried to slam the glove compartment shut, but it fell open, and Armstead saw a large amount of cash and a small plastic bag containing some green material that he thought looked like marijuana. When Goodman handed Armstead the pink piece of paper, he saw that it was not a registration card but a rental agreement for the car. Armstead asked Goodman once again for the registration, but Goodman insisted that it was not in the glove compartment. Goodman then closed and locked the glove compartment.
 
 
 4
 By this time, Armstead had recognized Goodman's passenger as George Riddick, a man he knew to have a reputation for involvement with drugs and fleeing from law enforcement officers. Armstead now suspected that there were illegal drugs in the car, based on what he had seen in the glove compartment and Goodman's peculiar behavior. He decided to search it. Before doing so, he decided to pat down Goodman and Riddick for weapons, in order to protect himself. He asked Goodman to give him the keys to the car, to prevent him from trying to start it up while he was patting down Riddick. When Goodman did so, Armstead went around to the passenger side of the car, asked Riddick to step out, and began to pat him down for weapons. He felt a lump in Riddick's shirt pocket, put his hand into the pocket, and found a small package of tinfoil, which he opened and found to contain cocaine. He then arrested and handcuffed Riddick.
 
 
 5
 While Armstead was patting down Riddick, he saw Goodman reach under the driver's seat of the car four or five times. He thought Goodman might be trying either to reach a weapon or to hide some contraband, and told him to stop. Goodman complied. Once Armstead had Riddick restrained, he asked Goodman to step out of the car and began to pat him down. He felt several bulges in Goodman's pockets, went into the pockets, and found two rolls of money, and a key ring with a large number of keys on it. He handcuffed Goodman and placed him in the patrol car, but did not formally arrest him. He then looked under the driver's seat of the car, where Goodman had been reaching, and found a loaded .38 special handgun with five live rounds and one spent round in a holster. Armstead then advised
 
 
 6
 Goodman that he was under arrest for carrying a concealed weapon and called for assistance from the Gates County Sheriff's Department.
 
 
 7
 When a deputy arrived, Armstead conducted a search of the glove compartment, which revealed several rolls of cash totalling $5,855,[1] a small plastic sandwich bag of the type normally used to package marijuana, and the car's registration. Inside the sandwich bag was a piece of green seat belt material. Armstead searched the rest of the car's interior quickly for contraband but found none. He then decided to impound the car for further searching and called a wrecker to tow it. While he was waiting for the wrecker to arrive, he decided to search the car's trunk. When he lifted a piece of carpet placed over the spare tire, he found a plastic grocery bag that contained several smaller bags, in which he found 31 grams of marijuana, 200.5 grams of cocaine, and three large clusters of crack cocaine weighing a total of 70 grams.
 
 
 8
 At the scene of the stop, Armstead gave Goodman his Miranda warnings. Goodman initially said that he did not want to answer any questions, but then agreed to do so. Armstead recorded the conversation in which Goodman agreed to waive his right to remain silent. In response to Armstead's questions, Goodman admitted that the gun and the money were his, but denied any knowledge of the drugs found in the trunk.
 
 
 9
 Goodman and Riddick were indicted on federal drug and firearm charges. Riddick pled guilty to a lesser offense and agreed to testify against Goodman at trial. Goodman filed pretrial motions to suppress the drugs and the gun seized during his stop and arrest, as well as the incriminating statements he made to Armstead thereafter. The district court referred these motions to a Magistrate Judge, who held an evidentiary hearing on them. At the hearing, the defense presented a transcript of the tape-recorded conversation between Armstead and Goodman in which Goodman purportedly waived his Miranda rights, and the testimony of Tyrone Scott Briscoe, who had been driving the second of the two cars that Armstead saw near Ike's Place that night.
 
 
 10
 Briscoe testified that he saw no erratic driving on the part of Goodman. The Magistrate Judge issued a report recommending that the motions to suppress be granted in their entirety. The Magistrate Judge reasoned that all evidence and statements obtained as a result of Armstead's investigatory stop of Goodman should be suppressed, because the stop was not supported by reasonable suspicion, and that the statements Goodman made to Armstead while in custody should be suppressed, because they were obtained in violation of his Miranda rights.
 
 
 11
 The government filed objections to the Magistrate Judge's report and requested a de novo hearing before the district court, contending that the transcript of the taped conversation relied upon by the Magistrate Judge was materially inaccurate, and that Briscoe's testimony was not credible.
 
 
 12
 At the de novo hearing held before District Judge Howard, Briscoe failed to appear. Judge Howard heard the testimony of Trooper Armstead, listened to the original tape recording of the conversation in which Goodman purportedly waived his right to remain silent, and reviewed a corrected transcript of that recording. He then issued an order denying Goodman's motions to suppress in their entirety.
 
 
 13
 At Goodman's trial before Judge Boyle and a jury, Riddick testified for the government that the gun found in the car belonged to Goodman and that he had seen him put the drugs into the trunk. The jury found Goodman guilty of possession of cocaine, crack, and marijuana, with intent to distribute, in violation of 21 U.S.C. Sec. 841(a)(1) and 18 USC Sec. 2, and of using and carrying a firearm in connection with a drug trafficking crime, in violation of 18 U.S.C. Sec. 924(c).
 
 
 14
 Three months later, Goodman filed a motion for new trial, based on two tape-recorded statements from Riddick in which Riddick attempted to recant his trial testimony. The district court held a hearing on the motion, at which Riddick testified. The district court found Riddick's renunciation of his trial testimony not credible, denied the motion for new trial, and sentenced Goodman to 181 months in prison. Goodman later renewed his motion for new trial, based on two letters from Riddick in which Riddick intimated that he had placed the drugs in the trunk without Goodman's knowledge. The district court found these letters not credible enough to justify a new trial and denied the motion again.
 
 
 15
 Goodman now appeals his conviction and sentence. He contends that the district court erred in (i) denying his motion to suppress the evidence seized during the January 1991 stop and arrest; (ii) denying his motion to suppress the incriminating statements he made to Armstead after he was taken into custody; and (iii) denying his motion for new trial based on his co-defendant's post-trial recantation of his trial testimony for the government.
 
 II.
 
 16
 We consider first Goodman's various arguments that the district court erred in admitting the evidence seized during the January 1991 stop and arrest. We conclude that the district court did not commit reversible error in refusing to suppress any of this evidence.
 
 A.
 
 17
 Goodman argues first that Armstead's initial stop of his car violated his Fourth Amendment rights, and that the district court should therefore have suppressed all of the evidence obtained as a result of that stop as fruit of the poisonous tree under Wong Sun v. United States, 371 U.S. 471 (1963). We disagree.
 
 
 18
 Under the Fourth Amendment, Armstead was justified in making a warrantless investigatory stop of Goodman's car if he had a reasonable suspicion, based on specific and articulable facts, that the occupants were engaged in unlawful activity. Terry v. Ohio, 392 U.S. 1 (1968); Delaware v. Prouse, 440 U.S. 648 (1979). Armstead testified in the pretrial suppression hearings that he suspected Goodman might be driving under the influence because he saw his car cross the center line while coming from the direction of Ike's Place, a notorious drinking spot, late at night, and because Goodman's behavior once he noticed that Armstead was following him--driving with extra care and turning off the main road at the earliest possible time--was consistent with the behavior of a drunk driver trying to avoid detection.
 
 
 19
 Goodman argued below that this testimony was not sufficient to support a finding that Armstead had a reasonable suspicion that Goodman was driving under the influence, and the Magistrate Judge agreed. The Magistrate Judge found Armstead's assertion that he saw Goodman's car cross the center line not credible, given the darkness, the relative positions of the cars, and Briscoe's testimony that he never saw Goodman's car cross the center line. JA 253-54, 265. The Magistrate Judge also found that even if Armstead had seen Goodman cross the center line, he would not have had a reasonable suspicion of drunk driving, since he admitted that he only saw Goodman go over the line once, by a mere foot and a half, and that he observed no further erratic driving after he began to follow him. JA 266. The Magistrate Judge therefore concluded that Armstead had not had a reasonable suspicion that Goodman was driving under the influence.
 
 
 20
 The district court reached the opposite conclusion, after hearing the same basic testimony from Armstead, but without the conflicting testimony of Briscoe, who did not show up for the de novo hearing.[2] The district court found as a fact that Armstead had seen Goodman's car cross the center line, JA 418f, based largely on its assessment that Armstead was "a very conscientious, careful, and extremely competent officer whose testimony, demeanor, and truthfulness ... [were] beyond reproach or suspicion." JA 418b. We review the district court's finding of the critical facts, not the Magistrate Judge's, and we do so under the clearly erroneous standard. Applying that standard, we cannot hold the court's findings clearly erroneous, depending as they did essentially upon the credibility of witnesses' conflicting versions of a typically ambiguous police-citizen stop and arrest encounter in the dark of night in a remote rural region. The findings are no more manifestly implausible than, concededly, were those of the Magistrate Judge who assessed the credibility of the principals differently. For this reason, we affirm the district court's ultimate finding that at the time Armstead first stopped Goodman, he had a reasonable suspicion that Goodman was driving under the influence.
 
 
 21
 Goodman argues that even if the facts known to Armstead were sufficient to give rise to a reasonable suspicion of drunk driving, the stop was still impermissible, because Armstead's true motivation for stopping him was not his alleged drunk driving, but an unsubstantiated hunch that he was involved in some sort of more serious criminal activity, because he was a black male driving a car with out-of-state tags late at night. He contends that the stop therefore violated the Fourth Amendment, because the alleged traffic violation was merely a pretext to stop the car in order to search for evidence of an unrelated crime as to which Armstead did not have reasonable suspicion. In support of this argument, he relies principally upon United States v. Smith, 799 F.2d 704, 708-10 (11th Cir.1986), which held that an investigatory stop is "pretextual"--hence impermissible under the Fourth Amendment--if a reasonable officer in the same circumstances would not have made the stop in the absence of an invalid motive.
 
 
 22
 We recently have rejected the Eleventh Circuit's approach to claims of pretextual stops, however, in favor of a wholly objective test that asks only whether the officer could validly have stopped the car for a traffic violation, even if he would not have done so but for his unsubstantiated suspicions of other criminal activity. United States v. Hassan El, 5 F.3d 726 (4th Cir. Sept. 3, 1993). Under that test, whenever a police officer observes a car commit a traffic offense, however minor, he has the right to make a brief investigatory stop, and that stop does not become unreasonable merely because the officer also has some unsupported suspicion that the occupants are engaged in some other criminal activity, and would have ignored the traffic violation but for those other suspicions. Id. at 730-31. Because the district court found that Armstead reasonably believed that Goodman had violated N.C. Gen.Stat. Sec. 20-146 (making it illegal to drive left of center line), the stop was permissible under Hassan El, even if Armstead would not have stopped Goodman for that violation had he not also had some unsupported suspicions that Goodman was engaged in more serious criminal activity. Accordingly, Goodman's argument that the stop was an impermissible "pretextual" stop must fail.
 
 B.
 
 23
 Goodman next contends that even if the original stop was a valid one, Armstead's searches of Goodman and his passenger Riddick were illegal, and that the district court should therefore have suppressed the evidence found during those searches of their persons. And, following up on this contention, he argues that the district court should have suppressed evidence of the drugs and firearm found in the subsequent searches of the car and its trunk, because without the drugs and money seized during the personal searches of the car's occupants, there would not have been probable cause to search the car.
 
 
 24
 Goodman concedes that when the police make a valid Terry stop, they may also conduct a limited pat-down search for weapons, so long as they have a reasonable suspicion that the person they are dealing with is armed and dangerous. Terry v. Ohio, 392 U.S. at 27. But he argues that Armstead did not have the right to pat down Riddick at all, because he did not have reasonable grounds to suspect that he was armed and dangerous, and that his search of Riddick's person exceeded the scope permitted by Terry. He also argues that even if Armstead had the right to pat down Goodman himself, he exceeded the scope of the limited protective search permitted by Terry when he went into his pockets and seized the rolls of money, since a reasonable officer would not have believed those objects to be weapons.
 
 
 25
 We find no reversible error here. Goodman may well be correct that Armstead's search of Riddick--in particular, his decision to open up the foil packets he found in Riddick's shirt pocket--exceeded the scope permitted by Terry, even after Minnesota v. Dickerson, --- U.S. ----, 61 U.S.L.W. 4544 (June 7, 1993) (permitting police to seize nonthreatening contraband detected during a Terry frisk, if its "contour or mass makes its identity [as contraband] immediately apparent"). But Goodman lacks standing to object to that search, even though the evidence seized during it was used against him at trial. See United States v. Padilla, 113 S.Ct.1936 (1993) (defendant has no standing to challenge admission of evidence obtained from illegal searches of co-defendants and co-conspirators; instead, "suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence"); United States v. Taylor, 857 F.2d 210, 214 (4th Cir.1988) (holding on virtually identical facts that defendant being prosecuted for drugs found on passenger in his car lacked standing to challenge search of passenger, even though evidence seized during that search was being introduced against him at trial, because "Fourth Amendment rights are ... personal rights," which co-defendants "lack standing to assert vicariously").
 
 
 26
 The only question properly before us, then, is whether Armstead's search of Goodman himself was legal. The district court held that Armstead had sufficient grounds to suspect that Goodman was armed and dangerous to justify a limited pat-down for weapons, and we do not think it erred in so holding. Armstead was alone when he stopped Goodman and Riddick. He was on a dark, country road, he had reason to believe that Goodman and Riddick had been drinking, and he could not see what was going on inside their car very well. When he asked Goodman for his registration, Goodman reached toward the glove compartment, turning his back to Armstead in an apparent effort to block his view, which led Armstead to fear that Goodman was trying to hide a weapon. He saw what looked like evidence of large-scale drug dealing in the glove compartment, he recognized Riddick as a known drug user with a reputation for fleeing from police officers, and he knew that those who traffic in large quantities of narcotics are often armed. In addition, when he was trying to frisk Riddick, he saw Goodman try several times to reach under the front seat of the car, as if he were trying to grab a weapon. Under these circumstances, we hold that Armstead had sufficient grounds to pat down Goodman for weapons. See United States v. Garza, 921 F.2d 59, 60 (5th Cir.1991) (officer who stopped car to arrest driver on traffic warrants had sufficient grounds to conduct patdown frisk of passenger, when he recognized him as a known heroin user who had previously had difficulties with the law and observed him making furtive movements as if he were trying to conceal something); United States v. Gilliard, 847 F.2d 21, 24-25 (1st Cir.1988) (officers who made Terry stop of car had sufficient grounds to conduct patdown frisk of occupants, when observed occupants behaving in nervous manner, had previously observed them conducting what appeared to be a drug transaction, and knew that firearms were "tools of the trade" for drug dealers).
 
 
 27
 Whether Armstead's search of Goodman's person, though justified at its inception, ultimately exceeded the scope permitted by Terry, is a much closer question. As the Supreme Court has emphasized repeatedly, the warrantless search authorized by Terry must be limited in scope to an intrusion that is reasonably designed to discover hidden weapons that might be used to harm the officer. Terry, 392 U.S. at 2526, 29; see Sibron v. New York, 392 U.S. 40, 65 (1968). In most cases, this means that the police officer must confine himself at the outset to patting down the outer surfaces of the suspect's clothing, and that he may intrude into the suspect's pockets or under the outer surface of his garments only if, during the course of that patdown, he feels an object that he reasonably believes could be a weapon that the suspect could use to harm him. Terry, 392 U.S. at 16. See generally 3 W. LaFave, Search and Seizure, Sec. 9.4(b) and (c) (2d ed. 1987 & Supp.1994).
 
 
 28
 Armstead testified that when he patted down Goodman's outer clothing, he felt some "bulges" in his pockets, which he discovered, "upon examination," to be some rolls of money and a key ring with a large number of keys on it. JA 112, 353. He did not testify specifically that he believed these "bulges" could be weapons when he first felt them, but such a belief would have been eminently reasonable under the circumstances, given the size, shape, and rigidity of the objects in question and Goodman's furtive behavior. See United States v. Clipper, 973 F.2d 944, 952 (D.C.Cir.1992) (finding reasonable officer's belief that a "large lump" in suspect's jacket pocket, which turned out to be a thick wad of currency, was a gun he had been told the suspect was carrying), cert. denied, 113 S.Ct. 1025 (1993); United States v. Strahan, 984 F.2d 155, 158 (6th Cir.1983) (finding reasonable officer's belief that a "bulge" in suspect's coat pocket, which turned out to be a metal money clip full of money, was some type of weapon); United States v. Anderson, 859 F.2d 1171, 1177 (3d Cir.1988) (finding reasonable officer's belief that a "large bulge" in suspect's pocket, which turned out to be a large roll of money, was a weapon); State v. Morrow, 603 A.2d 835, 838 (Del.1992) (finding reasonable officer's belief that"hard object" in suspect's front pants pocket, which turned out to be two tightly wrapped bags containing vials of crack, was the handle of a small gun); People v. Allen, 123 Cal.Rptr. 80, 82 (Cal.App.1975) (finding reasonable officer's belief that a "hard object" that he felt in suspect's front pants pocket, which turned out to be several keys taped together, was some sort of weapon that could be used to assault him).[3] For this reason, we think Armstead was justified in reaching into Goodman's pockets to determine whether the lumps he felt in them were in fact weapons. But Armstead may well have gone beyond the permissible bounds of a Terry search when he removed the money and the keys from Goodman's pockets, for his initial suspicion that those objects were weapons, though reasonable to begin with, was almost certainly dispelled when he put his hand into Goodman's pockets and actually felt them. See Clipper, 973 F.2d at 952 (though officer was justified in placing his hand into suspect's pocket to investigate "large lump" that he reasonably believed could have been a gun, he was not justified in removing that object, because he realized, while his hand was still in the pocket, that it was actually not a gun).
 
 
 29
 Even if Armstead violated Goodman's Fourth Amendment rights when he removed the rolls of money and keys from his pockets, however, that misconduct would not require suppression of the drugs and firearm that were later discovered under the seat and in the trunk of Goodman's car, because the items discovered in Goodman's pockets did not lead to the discovery of those items. Armstead looked under the driver's seat and discovered the weapon because he had seen Goodman reaching under it as if to grab or hide something, not because he had found rolls of money and keys in Goodman's pockets. He searched the trunk because he had probable cause, without regard to the items found in Goodman's pockets, to think that the car contained either illegal drugs or illegal firearms, based on Goodman's efforts to prevent him from looking in the glove compartment, his own view of the contents of the glove compartment, the cocaine he had found on Riddick, his knowledge that Riddick was a drug user, and his observation of Goodman reaching under the seat as if to grab a weapon or hide something. See infra Part II.C. Under these circumstances, we cannot agree with Goodman that the removal of the objects from his pockets, even if illegal, required the suppression of the drugs and gun later found in the car. See Clipper, 973 F.2d at 952 (although police officer may have exceeded scope of permissible Terry search when she removed object from suspect's pocket after she had already determined that it was not a weapon, that illegality did not require suppression of drugs found in subsequent search of suspect's person, because removal of object from pocket did not lead to discovery of drugs).
 
 C.
 
 30
 Goodman next claims that Armstead's searches of the car's interior--specifically, of the area under the driver's seat, the glove compartment, and the trunk--were illegal, and that the district court should therefore have suppressed all evidence seized during those searches.
 
 
 31
 Again, we do not agree. As the district court held, each of these searches was permissible under the vehicle exception, because Armstead had probable cause to think the car contained contraband or evidence of crime, he did not have time to get a warrant, and the areas in which he searched were places where such objects were likely to be found. See United States v. Ross, 456 U.S. 798 (1982).
 
 
 32
 Armstead plainly had probable cause to think the car contained contraband or evidence of crime when he began to search it. At that point, he had observed Goodman engaging in behavior that indicated there was something in the glove compartment that he did not want Armstead to see; seen what plausibly appeared to be (though, as it turned out, was actually not) a bag of marijuana, as well as a large amount of cash, in the glove compartment; recognized Goodman's passenger Riddick as a known drug user; found a personal-use amount of cocaine on Riddick's person; and seen Goodman reaching under the driver's seat several times, as if he were either trying to grab a weapon or to hide something. These facts are more than sufficient to support a finding that Armstead had probable cause to think the car might contain contraband of some sort--either illegal drugs, illegal firearms, or both--and thus the right to search the car for those items. See United States v. Turner, 933 F.2d 240, 242-44 (4th Cir.1991) (police had probable cause to think car contained contraband where observed drug paraphernalia and white powder between seats and occupants acting as if they were trying to hide something).
 
 
 33
 Because Armstead had probable cause to think the car contained contraband, he was authorized to search for that contraband in any place inside the car where he had reason to believe that the contraband might be found. United States v. Ross, 456 U.S. at 817-24. The permissible scope of this search could extend to any part of the car and its contents, including containers and packages found therein, that might conceal the contraband that was the object of the search.
 
 
 34
 Id. at 824-25. Under this rule, it was plainly permissible for Armstead to search under the driver's seat, in the glove box, in the trunk, and in the containers found inside the trunk, since all of those places could easily have concealed the type of contraband--drugs and firearms--that was the object of his search. Under these circumstances, the district court did not err in upholding the searches of the interior of the vehicle and its trunk. See id.[4]
 
 III.
 
 35
 Goodman claims next that the district court should have suppressed the incriminating statements he made to Trooper Armstead after his arrest, because those statements were obtained in violation of his rights under the Fifth Amendment and Miranda v. Arizona, 384 U.S. 436 (1966). We agree that the district court erred in refusing to suppress these statements, but find that error to be harmless.
 
 
 36
 After Trooper Armstead had arrested Goodman and placed him in the patrol car, he read him his Miranda rights. He began by telling Goodman that he was going to "advise you right now while we're riding in case you decide to talk some while we're riding." He then gave Goodman a standard set of Miranda warnings:
 
 
 37
 You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present while you're being questioned. If you cannot afford to hire one, the court will appoint one to represent you before any questioning if you wish. You can consent to answer questions now or without a lawyer present. You have a right to stop answering questions anytime you wish to do so. Do you understand these rights that I have explained to you?
 
 
 38
 When Goodman answered "Yes," Armstead asked, "O.K., having these rights in mind, do you wish to answer any questions?" Goodman responded, "No." Armstead then asked, "You don't want to answer no questions?" Goodman replied, "No. I don't have nothing to answer. I don't know what's going on." Armstead then said, "O.K. Well. You say you don't want to answer any questions?" Goodman responded, "I don't know what's going on." Armstead then gave the following explanation of what he was doing:
 
 
 39
 Well, I'm advising you of your rights as set forth by Miranda. In other words, I have to advise you of your rights set forth before Miranda when um you're going to be questioned and all, and that way if there's anything um you know that if anything you say can be used against you, don't necessary say that it will be or whether it won't be, more than likely it will be used against you in a court proceeding. Do you understand that?
 
 
 40
 (emphasis added). When Goodman responded "Yes," Armstead asked, "O.K. Now having those ... that right ... that in mind, do you wish to answer any questions that I have to ask you about that, you know, what's going on tonight?" This time Goodman replied, "I'll answer them if I can." Armstead then asked, "O.K. Do you want to do that without a lawyer being present?" Goodman said, "If I can answer them." Armstead said, "I need a yes or no. I can't have a if, you know, if I can. That don't work. I have to have a yes or a no." At that point Goodman finally said, "Yes, yes." He then admitted, in response to Armstead's questions, that his car had crossed the center line shortly before Armstead stopped him, and that the gun and the money were his.
 
 
 41
 The district court held that these statements were admissible because Goodman had validly waived his right to remain silent. Goodman now contends that this was error. His primary argument is that the alleged waiver was not voluntary, because he repeatedly expressed his wish to remain silent, and finally agreed to talk only when Armstead refused to accept that decision and continued to badger him.
 
 
 42
 We agree that Goodman's alleged waiver of his right to remain silent cannot be considered "voluntary." Goodman very plainly said "no" the first time Armstead asked him if he wanted to answer questions. At that point, Armstead should have stopped asking Goodman questions until he voluntarily reinitiated the dialogue. But Armstead did not; instead, he asked, in apparent disbelief,"you don't want to answer questions?" Goodman again said "no," but Armstead persisted, asking him two more times if he wanted to answer questions, before finally obtaining a positive response. A waiver obtained through such tactics cannot be considered voluntary. See United States v. Hernandez, 574 F.2d 1362, 1368-69 (5th Cir.1978) (waiver not voluntary where police continued to read suspect his rights, despite his invocation of right to remain silent, until he finally agreed to incriminate himself). Cf. Nash v. Estelle, 579 F.2d 513 (5th Cir.1979) (in determining whether suspect has voluntarily waived right to remain silent, critical factor is "whether a review of the whole event discloses that the interviewing agent has impinged on the exercise of the suspect's option to cut off the interview").
 
 
 43
 The government argues that Armstead's post-invocation questioning was permissible because it was designed merely to clarify that Goodman was in fact invoking his right to remain silent. Though we review at a blurring distance, and on a cold written record, we simply cannot accept that as an honest assessment of what this record reveals. Armstead's first post-invocation question to Goodman was plainly designed not to clarify but to badger, as there was nothing ambiguous about Goodman's initial statement that he did not want to answer any questions. There was no conceivable uncertainty until Goodman said, in response to this first improper inquiry, "No. I don't have nothing to answer. I don't know what's going on." We do not think that responses to further interrogation that is itself improper can be used to cast retrospective doubt on the clarity on an initial assertion of the right to remain silent. Cf. Smith v. Illinois, 469 U.S. 91 (1984) (when suspect makes an unequivocal assertion of his right to counsel, as opposed to his right to remain silent, his post-assertion responses to improper further questioning by the police cannot be used to cast doubt on the clarity of that initial assertion).
 
 
 44
 The government also suggests, and the district court held, that Armstead's post-assertion questions were permissible because they were made after Goodman voluntarily reinitiated the dialogue by saying "I don't know what's going on." But this remark, which was made in direct response to Armstead's improper badgering, just moments after Goodman stated for a second time that he did not want to answer any questions, cannot possibly be considered to be the sort of voluntary reinitiation of conversation to which the Miranda cases refer. Indeed, Goodman's remark that he did not know what was going on, read in context, seems clearly to have been an explanation for his decision not to answer questions, not an effort to open the dialogue back up.
 
 
 45
 We conclude that Goodman did not voluntarily waive his right to remain silent, and that the district court therefore erred in not suppressing the statements that Goodman made to Armstead following his arrest.[5] This was impermissible police practice that, however understandable under the circumstances, jeopardized the ensuing prosecution of an obviously guilty person. It is saved here only because we are able to conclude that the judicial error of not suppressing the fruits of the invalid interrogation that occurred was harmless beyond a reasonable doubt. See Chapman v. United States, 386 U.S. 18 (1967). The government did not introduce Goodman's incriminatory statements at trial nor use them in cross-examination, Goodman having elected to put on no defense at trial. One of the incriminating statements--Goodman's admission that his car had crossed the center line just before Armstead pulled him--was, however, put in evidence in the pre-trial suppression hearing. JA 368-69. The district court specifically referred to this admission in finding that Armstead had a reasonable suspicion that Goodman was driving under the influence. But it seems clear that the district court would have reached the same conclusion even without that admission, since the critical inquiry was not whether Goodman did in fact cross the center line, but whether Armstead reasonably believed that he had done so. We therefore decline to reverse the convictions on the basis of this error.
 
 IV.
 
 46
 Goodman contends finally that the district court committed reversible error when it denied his motion for new trial based on Riddick's recantation of his trial testimony. Br. 44-49. This claim is patently without merit. A motion for new trial based upon recantation of trial testimony is to be regarded "with the utmost suspicion." United States v. Johnson, 487 F.2d 1278, 1279 (4th Cir.1973). As the district court held and Goodman concedes, a court may grant a new trial based on the recantation of trial testimony only when:
 
 
 47
 (1) the court is "reasonably well satisfied" that the trial testimony of a material witness was false,
 
 
 48
 (2) that without this false testimony, the jury might have reached a different conclusion, and
 
 
 49
 (3) that the party seeking the new trial was unable to contradict the false testimony at trial, either because he was taken by surprise when it was given or because he did not learn of its falsity until after trial.
 
 
 50
 United States v. Wallace, 528 F.2d 863, 866 (4th Cir.1976). The district court held that Goodman had not satisfied the first prong of this test, and we do not think it erred in so holding.
 
 
 51
 At trial, Riddick testified for the government that he had purchased cocaine from Goodman in the past, that he had seen Goodman with the gun found in the car before and knew it belonged to him, and that he had seen Goodman place the plastic grocery bag in which the drugs were found in the trunk of the car several hours before their arrest. Several months after the trial, Riddick delivered a tape-recorded statement to Goodman's attorney, in which he recanted parts of this trial testimony. Goodman filed a motion for new trial based on this tape-recorded recantation. After the government filed a response to the motion which challenged the credibility of Riddick's recantation, Riddick delivered a second tape-recorded statement to Goodman's attorney, in which he again attempted to recant his trial testimony.
 
 
 52
 The district judge who had presided over Goodman's trial, held an evidentiary hearing on his motion for new trial. At that hearing, Riddick testified that his trial testimony about Goodman's prior possession of the gun and the drugs had been false, saying alternatively that he had been "mistaken" and that he had been "pressured" into giving false testimony by the police and his own defense attorney. Riddick also testified that he had made the tapes recanting his testimony alone and on his own initiative, and that his only contact with Goodman after the trial had been "five or six" brief telephone conversations.
 
 
 53
 The government, on the other hand, presented considerable evidence that Riddick had recanted his trial testimony because he had been pressured to do so by Goodman. For example, it introduced telephone records showing that Goodman had actually called Riddick at his home at least 46 times in the six weeks after the trial, and that these conversations had lasted a total of over five and a half hours. The government also offered the testimony of George Hall, an associate of Goodman and Riddick's, who said that Riddick made the second tape because Hall told him, at Goodman's request, that the first one was not "clear enough." The government demonstrated that the first tape was perfectly "clear," in terms of audibility, and suggested that Hall had meant instead that the tape was not"clear enough" to achieve the desired result. The government also challenged Riddick's claim that he had made the tapes by himself, pointing out that a voice other than Riddick's could be heard saying "Go ahead" at the beginning of the first tape, just before Riddick began to speak.
 
 
 54
 After hearing this evidence, the district court denied Goodman's motion for new trial on the ground that he had failed to show a reasonable probability that Riddick's trial testimony was false. The court explained that after "observing Riddick during his testimony at the hearing," it "did not find him a credible witness," and was "therefore not satisfied that his trial testimony was false as now alleged." The court also remarked that "the government's cross-examination of Riddick's hearing testimony revealed significant inconsistencies which he was unable to adequately or convincingly explain." JA 791; see also JA 812 (explaining that Riddick's testimony at the hearing was "fraught with contradictions and inconsistencies" and that his "renunciation of his trial testimony was not credible").
 
 
 55
 Four days after the district court entered this order, Riddick mailed two letters to Goodman, in which he again attempted to recant his trial testimony. Goodman renewed his motion for new trial, based on these letters. The district court again denied the motion, finding that Riddick's statements in these letters "contradict[ed] both his trial and hearing testimony," and that they were "neither credible nor adequate to justify a new trial." JA 813.
 
 
 56
 On this evidentiary record, the district court's finding that Goodman had not satisfied the first requirement of the Wallace test--showing that Riddick's trial testimony was false--was not clearly erroneous. Accordingly, the district court did not abuse its discretion in denying the motion for new trial.
 
 V.
 
 57
 For the foregoing reasons, the judgment of the district court is
 
 
 58
 AFFIRMED.
 
 
 
 [1]
 The bulk of this cash was in four rolls of bills, each of $1200. As SBI Agent Barnette testified at trial, $1200 was then the going price for an ounce of cocaine in the Gates County area
 
 
 [2]
 The district court also considered Goodman's own admission that he had in fact crossed the center line, which the magistrate had suppressed under Miranda
 
 
 [3]
 Compare United States v. Del Toro, 464 F.2d 520, 522 (2d Cir.1972) (finding unreasonable officer's belief that a "small and flexible object" in the handkerchief pocket of suspect's suit coat, which turned out to be a ten dollar bill folded around some cocaine, was a weapon)
 
 
 [4]
 In view of our holding that the searches of the area under the driver's seat, the glove box, and the trunk can be upheld under the vehicle exception, we need not address the government's alternative contentions that the search of the area under the driver's seat was justified under Michigan v. Long, 463 U.S. 1032 (1983), because Armstead had reasonable grounds to suspect that it might contain a weapon that Goodman could use against him, or that the search of the glove box was justified as a valid search incident to Goodman's arrest, under the doctrine of New York v. Belton, 453 U.S. 454 (1981)
 
 
 [5]
 Because we find that Goodman's alleged waiver of his right to remain silent was not "voluntary," we need not address his alternative argument that the alleged waiver, even if "voluntary," was not "knowing and intelligent," because the warnings Armstead gave him were not adequate to advise him of his rights