# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellant,*

v.

HARSIMRAT SINGH; RANDHIR SINGH
KHANGURA,

        *Defendants-Appellees.*

No. 03-4715

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
James A. Beaty, Jr., District Judge.
(CR-03-94)

Argued: January 23, 2004

Decided: April 2, 2004

Before WILLIAMS, TRAXLER, and KING, Circuit Judges.

Reversed and remanded by published opinion. Judge King wrote the
opinion, in which Judge Williams and Judge Traxler joined.

## COUNSEL

**ARGUED:** Kearns Davis, Assistant United States Attorney, Greens-
boro, North Carolina, for Appellant. William Lindsay Osteen, Jr.,
ADAMS & OSTEEN, Greensboro, North Carolina, for Appellee Har-
simrat Singh; James Daniel Williams, Jr., Durham, North Carolina,
for Appellee Randhir Singh Khangura. **ON BRIEF:** Anna Mills Wag-
oner, United States Attorney, Sandra J. Hairston, Assistant United
States Attorney, Greensboro, North Carolina, for Appellant.

**OPINION**

KING, Circuit Judge:

Harsimrat Singh and Randhir Singh Khangura were indicted on March 31, 2003, in the Middle District of North Carolina for possession with intent to distribute marijuana. Singh and Khangura thereafter sought to suppress a large quantity of marijuana and currency seized from the trailer of their tractor-trailer rig. The district court heard evidence on the suppression issues and granted the relief requested. *United States v. Singh*, No. 1:03CR94-1 (M.D.N.C. Aug. 28, 2003) (the "Opinion"). The Government has appealed, maintaining that the court erred in ruling the seizure unconstitutional. Because the seizure was supported by probable cause and passes constitutional muster, we reverse and remand.

I.

A.

The facts underlying this dispute, as presented to the district court at an evidentiary hearing in Winston-Salem on July 28 and 29, 2003, are largely uncontroverted.[1] On March 8, 2003, federal agent Eric Green learned from a confidential informant in Atlanta, Georgia (the "CI"), that a tractor-trailer rig (the "Rig") containing a large quantity of marijuana had broken down on Interstate 85 ("I-85") south at milepost 201 or 202 near Greensboro, North Carolina. The CI further advised Green that the disabled Rig's tractor was silver in color, that its tractor and trailer bore Canadian license plates, and that it was being driven from Canada to Atlanta by "two Indian males" who were awaiting tow truck assistance. Opinion at 2. Green relayed this information to one of his colleagues in the Bureau of Immigration and Customs Enforcement ("BICE"), agent James Bryant, in Charlotte, North Carolina. Bryant, in an effort to locate and intercept the smuggled contraband, relayed this information to the North Carolina Highway Patrol (the "NCHP"). J.A. 69, 71.

---

[1] In laying out the relevant facts, we are mindful of our obligation to defer to the findings of the district court in the absence of clear error. *See Ornelas v. United States*, 517 U.S. 690, 699 (1996).

After determining that mileposts 201 and 202 on I-85 were not in the Greensboro area, the NCHP attempted to locate the Rig at milepost 101 on I-85 and at milepost 202 on Interstate 40, near Greensboro. Failing to locate the disabled Rig at these locations, NCHP officers recontacted agent Bryant to seek clarification on the location of the Rig. Bryant, in turn, contacted agent Green in Atlanta, requesting such information. J.A. 92. As a result, the CI phoned the truckers, who were with the disabled Rig in North Carolina, and obtained clarification on their location. Through these communications, the CI, in agent Green's presence, ascertained from the truckers that the disabled Rig was near milepost 202 on I-85, approximately seventy miles north of Greensboro and just south of the North Carolina-Virginia line. This information was then relayed to the NCHP. Opinion at 2-3. (The information provided by the CI is hereinafter referred to as "the Tip.")

Upon determining that milepost 202 on I-85 was located in North Carolina's Granville County, NCHP Sergeant Bill Grey directed an officer to go there, and he confirmed the presence of a disabled rig matching the description provided by the CI. When that information was relayed to Grey, three NCHP officers — Grey, Terry Siler, and Greg Strader — departed the Greensboro area in separate cruisers, proceeding north seventy to eighty miles on I-85 to Granville County. Contemporaneously, Grey contacted an NCHP K-9 narcotic detection unit and requested that it proceed to milepost 202 to assist in locating contraband.[2] *Id.* at 3.

Upon reaching milepost 202, the officers located the disabled Rig. By that time, the trailer of the Rig had been dismounted from its tractor, and the tractor and trailer were attached to separate tow trucks. Because the officers were unable to cross the I-85 median, they proceeded north to Exit 204 before turning southbound. Strader then proceeded to the site where they had observed the disabled Rig, and Grey and Siler followed shortly thereafter. When Strader arrived at milepost 202, the tow trucks had departed, towing the Rig south on I-85.

---

[2]Sergeant Grey and Trooper Strader are part of the NCHP Criminal Interdiction Team, whose members have received additional training in criminal interdiction skills. The K-9 narcotic detection unit is also part of the Team. Opinion at 2; J.A. 199.

Consequently, Strader, Grey, and Siler continued south on I-85 in search of the Rig. *Id.* at 3-4.

Upon locating the Rig, Strader observed that the lead tow truck was towing the Rig's trailer and that the other tow truck, with the Rig's tractor, was following closely behind. Opinion at 4. He also observed that the Rig's tractor and trailer each bore Canadian license plates. J.A. 167. Using his speed detection equipment, Strader determined that the lead tow truck was travelling seventy-one miles per hour in a sixty-five mile-per-hour work zone, and he stopped it at I-85's milepost 180, near Oxford, in Durham County. J.A. 152. The second tow truck then also stopped, pulling onto the shoulder of I-85 in front of the lead tow truck and Strader's cruiser. Opinion at 5.

The driver of the speeding tow truck, Erskine Williamson, exited to speak with Strader, and the two men met at the front of the truck. As Strader was explaining the speeding incident to Williamson, they were joined by Michael Huff, the driver of the second tow truck. Soon thereafter, Grey joined the conversation, and Strader asked Williamson whether the Rig had been in an accident or had broken down. Williamson explained that the Rig had broken down, that one of the Rig's occupants was the passenger in his tow truck, and that the other trucker was in Huff's truck. Williamson advised the officers that the truckers "were anxious to have their tractor repaired as soon as possible, no matter what the price," and that they wanted the tractor "towed to the repair shop where Williamson and Huff worked but wanted the trailer towed to a different location so it could be picked up." *Id.* at 6. Huff advised the officers that the trucker in his tow truck had become "visibly nervous or agitated" upon seeing Strader pull alongside. *Id.* Indeed, according to Huff, after seeing Strader signal for Williamson to stop, the trucker in Huff's tow truck "almost jumped out of his skin" and immediately attempted to place a call on his cell phone. J.A. 207. Strader, Williamson, and Huff viewed this behavior as both "strange" and "unusual."[3] J.A. 125, 148, 151, 309.

---

[3]Williamson and Huff testified that they advised Strader and Grey about Singh's and Khangura's behavior after Strader issued Williamson a warning citation for speeding. Strader and Grey, on the other hand, testified that Williamson and Huff discussed Singh's and Khangura's behavior prior to issuance of the citation. Opinion at 6-7. This apparent discrepancy is irrelevant to our assessment.

Strader then directed Khangura to exit Williamson's tow truck. After joining the two officers, Khangura was identified, and he was questioned by Strader regarding the Rig and its contents. Strader ascertained that Khangura and his co-driver were not American citizens, but were "from another country." J.A. 180-81. Khangura explained that he and his co-driver were travelling from Boston to Charlotte and that they were running empty, hoping to arrange for a load in Charlotte. Opinion at 7-8. Grey and Strader considered these responses suspicious, doubting that such a long journey would be undertaken with no guarantee of remuneration. J.A. 148, 207. Strader then returned to his cruiser with Williamson and Grey and wrote Williamson a warning citation for speeding. Meanwhile, Huff and Khangura remained near the front of Williamson's truck. Opinion at 8.

After Strader prepared the citation, Williamson was advised to "stand by" while the officers spoke with Singh and Khangura. Grey and Williamson then rejoined Huff and Khangura. Strader, however, went past the group to Huff's tow truck and requested Singh to exit it. Singh was questioned briefly, and he generally provided the same responses Strader had received from Khangura. Additionally, Singh explained that he had worked for Yadu Transport, the company named on the trailer, for three weeks. Khangura stated that he had worked for Yadu for only one week. Singh and Khangura then provided conflicting information regarding the number of rigs in Yadu's truck fleet. They were then asked if they had marijuana, cocaine, or guns in the tractor or the trailer, and both responded in the negative. In light of the Tip and the corroborating circumstances, the officers requested permission to search the Rig, and at least one of the two men orally consented. The officers then presented Singh and Khangura with a written consent-to-search form, memorializing the verbal consent, which they both executed.[4] *Id.* at 8-9.

Shortly after Singh and Khangura signed the consent-to-search form, the NCHP K-9 unit, which had been requested to stand by, arrived and used its drug detection dog "Rico" to sweep the outside

---

[4]The consent-to-search form signed by Singh and Khangura consented to a complete search of a gray Peterbilt TTT (truck, tractor, and trailer), the tractor of which bore Ontario, Canada, license PT 2768. J.A. 33.

of the Rig's tractor and trailer. Rico alerted to the "odor of narcotics" at the left side of the front of the trailer and at the trailer's rear doors.[5] *Id.* at 9. The officers then opened the unlocked doors of the Rig's trailer and found that two plywood panels lining the front wall "seemed different" — they were "newer in color" and had a different general appearance from those panels lining the trailer's side walls. *Id.* at 10. Rico was placed inside the trailer, and he immediately "alerted on the front wall." *Id.* The plywood panels were then removed and several black duffle bags and a Heineken beer box were discovered. The duffle bags contained approximately 500 pounds of marijuana, and the Heineken beer box contained more than $300,000 in United States currency. *Id.* The officers promptly seized the marijuana and currency and took Singh and Khangura into custody.

### B.

Less than a month later, on March 31, 2003, Singh and Khangura were indicted by the grand jury in Greensboro. Singh filed a suppression motion on April 16, 2003, asserting that the search of the trailer was unconstitutional because it was unsupported by either a warrant or consent. The motion was adopted by Khangura the following day. Singh later filed a supplemental motion to suppress, asserting that the seizure resulted from an unconstitutional *Terry* stop. *See Terry v. Ohio*, 392 U.S. 1 (1968) (holding that investigatory stops must be supported by reasonable suspicion of criminal activity).[6] Williamson, Huff, and various law enforcement officers testified at the evidentiary hearing on these motions.

After assessing the evidence under *Terry* and its progeny, the district court filed its Opinion suppressing the marijuana and currency seized from the Rig's trailer. In so doing, the court focused on whether the detention of Singh and Khangura by the officers "'was

---

[5]The drug detection dog was trained to alert to marijuana, cocaine, crack cocaine, heroin, or methamphetamine by barking, biting, or scratching in the area of a detected substance. J.A. 273.

[6]An investigatory *Terry* stop implicates Fourth Amendment jurisprudence. The Fourth Amendment guarantees, in pertinent part, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

reasonably related in scope to the circumstances which justified the interference in the first place.'"[7] Opinion at 23 (quoting *Terry*, 392 U.S. at 20). The court then analyzed the evidence against the "proper investigative scope for a routine traffic stop," relying on our decision in *United States v. Rusher*, 966 F.2d 868, 876 (4th Cir. 1992) (discussing proper scope of routine traffic stop). Opinion at 13.

The court concluded that the officers had exhibited such a show of authority that "a reasonable person in the position of either of the Defendants stopped alongside I-85 would not have felt free to decline the officers' requests or otherwise terminate the encounter." *Id.* at 14. As a result, the court found that Singh and Khangura "were seized at, if not before, the point when . . . Singh was summoned from Mr. Huff's wrecker and escorted to the front of Mr. Williamson's wrecker where both Defendants were then questioned." *Id.* at 15. Having decided that Singh and Khangura had been "seized," the court turned to whether the officers possessed a reasonable suspicion of criminal activity sufficient to warrant their seizure. In addressing this issue, the court found that "this was an ordinary traffic stop," and that a reasonable suspicion did not develop by the time the warning citation had been issued. *Id.* at 19, 23. In so ruling, the court observed that "the Government has failed to meet its 'burden to articulate facts sufficient to support reasonable suspicion,' given the totality of the circumstances." *Id.* at 23 (quoting *United States v. Burton*, 228 F.3d 524, 528 (4th Cir. 2000)).

Finally, the court turned to the information obtained from the CI in Atlanta. It observed that the officers failed "to verify any of this information during their stop" in order to use it for a "reasonable suspicion that justified the seizure and questioning of the Defendants." *Id.* at 24. Indeed, according to the court, the only confirmation of the Tip was "that they located a tractor trailer that had been broken down at milepost 202 on I-85." *Id.* The court — relying on testimony that the officers stopped Williamson's tow truck for speeding and that the Tip was irrelevant to the stop — disregarded the Tip and its corrobo-

---

[7]The propriety of an investigative detention under *Terry* turns on two inquiries — whether an officer's action was justified at its inception, and whether the scope of the detention was reasonably related to the circumstances justifying the interference. *Terry*, 392 U.S. at 20.

rating evidence in assessing whether the seizure of Singh and Khangura was supported by a reasonable, articulable suspicion that criminal activity was afoot.[8] *Id.* at 25. The court then decided that the search of the trailer was unconstitutional and held that the evidentiary use of the marijuana and currency must be suppressed. *Id.* at 25-26. The Government has appealed the suppression of its evidence, and we possess jurisdiction pursuant to 18 U.S.C. § 3731.

II.

In assessing issues of reasonable suspicion and probable cause in a search and seizure context, we review de novo the legal determinations of a district court. *Park v. Shiflett*, 250 F.3d 843, 849 (4th Cir. 2001) (observing that determinations of reasonable suspicion and probable cause are reviewed de novo) (citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996)). On the other hand, we review a district court's factual findings on issues of reasonable suspicion and probable cause for clear error, giving due weight to inferences justifiably drawn from those facts. *Ornelas*, 517 U.S. at 699. A factual finding is clearly erroneous when, through our review of the evidence, we are left with the definite and firm conviction that a mistake has been committed. *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

A determination of reasonable suspicion or probable cause does not depend on any single factor, but on the totality of the circumstances. *United States v. Sokolow*, 490 U.S. 1, 8 (1989) (reasonable suspicion);

---

[8]Sergeant Grey confirmed that the officers were "looking for the truck" and that the purpose of multiple officers travelling "four to five counties was to find this broken-down tractor-trailer and truck." J.A. 240. Grey also agreed that he would not "have been there to stop the wrecker if not for the [T]ip," as the Tip provided the "motive" to find the Rig. J.A. 249. Officer Siler confirmed this point, agreeing that the "investigation didn't center around a speeding truck. It centered around [the] [T]ip." J.A. 105. Trooper Strader further confirmed that the officers "spent three hours running around the highways of . . . North Carolina chasing down a [broken down] tractor-trailer." J.A. 166. According to agent Bryant, reliance on a traffic violation to justify the stop was an effort to "wall off" the CI, apparently to protect the CI's identity. J.A. 82.

*Illinois v. Gates*, 462 U.S. 213, 232 (1983) (probable cause). In addressing such issues, we assess the relevant facts known to the authorities and decide whether those facts, "from the standpoint of an objectively reasonable police officer," give rise to reasonable suspicion or probable cause. *Ornelas*, 517 U.S. at 696.

### III.

On appeal, the Government asserts that the district court erred in disregarding the Tip and its corroborating evidence. It further contends that the court erred in characterizing the stop and seizure of the Rig and its occupants as an "ordinary traffic stop." As explained below, the court did err in disregarding the Tip and its corroborating evidence. And the court's finding that the authorities were involved in an ordinary traffic stop was clearly erroneous. As our analysis reflects, the investigatory seizure of the Rig and its occupants was supported by a reasonable suspicion of criminal activity, and the search of the trailer was premised on probable cause.

### A.

First, the Government contends that the district court erred in disregarding the Tip and its corroborating evidence in assessing the legality of the stop and seizure of the Rig and its occupants. The Government maintains that, when the stop occurred, the authorities possessed a reasonable and articulable suspicion that Singh and Khangura were engaged in criminal activity, and such suspicion justified the stop of the Rig and the seizure of its occupants. On this point, it is elementary that the authorities are entitled to stop a moving vehicle reasonably suspected of involvement in smuggling contraband, and they may briefly detain and investigate such a vehicle and its occupants. *See*, *e.g.*, *United States v. Sharpe*, 470 U.S. 675, 687-88 (1985) (holding stop of vehicle and subsequent twenty-minute investigatory detention reasonable where authorities observed circumstances indicative of drug trafficking). The first issue we must assess is whether, when this stop occurred, the authorities possessed a reasonable suspicion that Singh and Khangura were smuggling contraband.

A reasonable suspicion exists when law enforcement officers possess "'a particularized and objective basis' for suspecting the person

stopped of criminal activity." *Ornelas*, 517 U.S. at 696 (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). Although an unverified tip from a known informant may alone justify a reasonable suspicion of criminal activity, the Tip was not unverified. Indeed, it was substantially corroborated by the developing circumstances. *See United States v. Spotts*, 275 F.3d 714, 720 (8th Cir. 2002) ("A tip from a known informant can suffice by itself to establish reasonable suspicion for a vehicle stop, even if the police do not corroborate the tip prior to the stop with their own independent observation.") (citing *Adams v. Williams*, 407 U.S. 143, 146-47 (1972)).[9]

It is uncontested that, when the stop occurred, the authorities possessed information from the CI in Atlanta that two Indian males were transporting marijuana from Canada to Atlanta; that they were driving a silver tractor-trailer bearing Canadian plates; and that the Rig had broken down in North Carolina near milepost 202 on I-85. In addition to being a known informant, the CI was in the presence of agent Green as the CI was receiving information from Singh and Khangura. The officers verified the CI's information that a silver tractor-trailer bearing Canadian plates had broken down near milepost 202 on I-85 in North Carolina. Furthermore, the officers generally corroborated the Tip with respect to Singh's and Khangura's gender and national origin. In sum, the Tip was provided by a known informant who was obtaining real-time information directly from Singh and Khangura, and the Tip proved to be reliable. *See Alabama v. White*, 496 U.S. 325, 330-31 (1990) (observing that, in assessing tip's credibility, court must weigh its reliability and basis of informant's knowledge).

In light of the Supreme Court's decision in *Maryland v. Macon*, 472 U.S. 463 (1985), the district court erred as a matter of law when it decided to disregard the Tip and its corroborating evidence. In *Macon*, the Court held that an officer's actions in Fourth Amendment situations are to be viewed objectively by a reviewing court, taking into account all relevant facts and circumstances. In rejecting a subjective assessment of such an officer's state of mind, the Court observed that:

---

[9]As the Supreme Court has observed, a tip from a known informant is entitled to greater weight than a tip from an anonymous informant. *Adams*, 407 U.S. at 147.

>   Whether a Fourth Amendment violation has occurred "turns
>   on an *objective assessment* of the officer's actions in light
>   of the facts and circumstances confronting him at the time,"
>   and *not on the officer's actual state of mind at the time the
>   challenged action was taken.*

*Id.* at 470-71 (quoting *Scott v. United States*, 436 U.S. 128, 136 (1978)) (emphases added). Pursuant to *Macon*, the district court was obliged to objectively assess whether, in the totality of the circumstances, the officers possessed a reasonable suspicion justifying the stop and seizure of the Rig and its occupants; the subjective views of the officers were simply irrelevant. *See United States v. Hassan El*, 5 F.3d 726, 729-31 (4th Cir. 1993) (adopting "purely objective" standard for evaluating whether officer's allegedly pretextual traffic stop comported with Fourth Amendment); *Martin v. Gentile*, 849 F.2d 863, 869 (4th Cir. 1988) ("Subjectively bad intentions on the part of the individual officer will not make a constitutional violation out of an otherwise reasonable seizure . . . .") (citations omitted).

   In the totality of the circumstances, including the Tip and its corroborating evidence, the officers possessed a reasonable suspicion, when the Rig was stopped, that it contained contraband and that its occupants were smuggling that contraband from Canada to Georgia. Strikingly, the district court appeared to acknowledge that the Tip, had it been considered, would alone have justified stopping the Rig, seizing its occupants, and searching the trailer. During the suppression hearing, the court observed that if the Tip had been part of the totality of the circumstances, the seizure would have been justified under *Terry*. The court stated that "[t]he reliability of the tip, whatever they say, whether it's [Interstate] 85, [Interstate] 40, there's enough there for that in and of itself to be sufficient for the officers to do what they did." J.A. 379. In ruling the Tip to be irrelevant, however, the court ignored the principles of *Macon* and its progeny, and it failed to objectively assess the totality of the relevant circumstances. *See, e.g.*, *Hassan El*, 5 F.3d at 730-31; *Martin*, 849 F.2d at 869.

### B.

   Because the Tip and its corroborating evidence were disregarded, the court erroneously found, as a factual matter, that the officers were

involved in an "ordinary traffic stop." And the court's determination that this was an ordinary traffic stop led it to analyze the situation under our decision in *Rusher*. Opinion at 19. We are, however, presented with markedly different circumstances. In *Rusher*, we examined a situation where moving violations precipitated a "routine traffic stop," and where a subsequent consensual investigation uncovered guns and narcotics. *Rusher*, 966 F.2d 868. We explained that the proper investigative scope of a routine traffic stop includes requesting a driver's license and vehicle registration, running a computer check, and issuing a citation. *Id.* at 876. If the driver produces a valid license and proof that he is entitled to operate the vehicle, he may, upon issuance of the citation, "proceed on his way, without being subject to further delay by police for additional questioning." *Id.* Significantly, however, nothing had occurred before the traffic stop in *Rusher* to provide any suspicion that the vehicle was transporting contraband.

Here, as Sergeant Grey confirmed, the Tip provided the basis for the authorities' concerted effort to locate the disabled Rig. And contrary to the view of the district court, the investigation of the Rig did not center on a speeding violation — it centered on the Tip. *See supra* note 8. The officers initially learned about the disabled Rig from the informant in Atlanta. When Grey, Siler, and Strader received the Tip, they were more than seventy miles from the disabled Rig. Upon receiving clarifying information from the CI, an officer was dispatched to milepost 202 to corroborate the Tip. After the disabled Rig was found at milepost 202, Grey, Siler, and Strader drove more than seventy miles north on I-85 to intercept it. While proceeding north on I-85, Grey contacted the NCHP K-9 narcotic detection unit, directed it to milepost 202, and requested that it stand by to sweep the Rig. In the totality of the circumstances, we are led to the definite and firm conviction that a mistake has been committed, and the court's finding that this was an "ordinary traffic stop" is clearly erroneous. As we have explained, the record establishes that the investigation of the Rig and its occupants centered on the Tip — not on a speeding tow truck.

### C.

Finally, we turn to whether the search of the trailer and the seizure of the marijuana and currency were constitutionally permissible. As the Supreme Court has explained, "[t]he scope of [a] search must be

'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *Terry*, 392 U.S. at 19 (quoting *Warden v. Hayden*, 387 U.S. 294, 310 (1967) (Fortas, J., concurring)). Where reasonable suspicion exists to support the stop of a moving vehicle, officers are entitled to conduct an investigatory detention to obtain consent to search or to develop probable cause. *See United States v. Brignoni-Ponce*, 422 U.S. 873 (1975) (recognizing, in context of investigatory stop, that authorities may question driver and passengers about suspicious circumstances); *see also Sharpe*, 470 U.S. 675 (holding twenty-minute investigatory detention reasonable following vehicle stop). In this situation, the detention of Singh and Khangura was both brief and non-intrusive and, when the search occurred, there was probable cause to believe that marijuana would be discovered in the trailer.

During the stop, the officers obtained significant additional information bearing on the probable cause issue. This information included Singh being "visibly nervous and agitated" when Strader stopped Williamson's tow truck; Singh hurriedly attempting to place a call on his cell phone; Singh and Khangura requesting that the tractor be repaired immediately "no matter what the price"; Singh and Khangura requesting that the trailer be towed to a different location so that it could be "picked up"; Singh and Khangura being "nervous"; and the tow truck drivers viewing the behavior of Singh and Khangura to be "strange" and "unusual." *See supra* p. 4. This additional information, along with the Tip and its corroborating evidence, rendered the questioning of Singh and Khangura reasonable and permissible.

The responses made by Singh and Khangura after the stop occurred warranted a heightened suspicion that criminal activity was afoot. These responses revealed that Singh and Khangura were not experienced truckers, and that they claimed to be travelling unloaded from Boston, hoping to secure a load in Charlotte. They also provided the officers with conflicting information regarding Yadu Transport. *See supra* p. 5. Given the views of the tow truck drivers that Singh and Khangura were nervous, anxious, and agitated, and the officers' views that Singh's and Khangura's responses were suspicious, further investigation was warranted.

Although the Tip, its corroborating evidence, and the roadside investigation may have warranted a search of the trailer, the officers took further precautions. First, they secured Singh's and Khangura's written consent to search.[10] Second, they utilized their narcotic detection dog Rico to examine the outside of the trailer. The dog promptly alerted to the odor of narcotics at the left side of the front of the trailer and at the trailer's rear doors. Those reactions, coupled with the other relevant circumstances, provided probable cause for the actions of the officers. *See Florida v. Royer*, 460 U.S. 491, 505-06 (1983) (recognizing that drug dog's positive alert establishes probable cause); *United States v. McFarley*, 991 F.2d 1188, 1193 (4th Cir. 1994) (same). In sum, an assessment of the totality of the circumstances reveals that the officers possessed probable cause to search the trailer.[11]

IV.

Pursuant to the foregoing, we reverse the suppression of the marijuana and currency seized from the trailer, and we remand for additional proceedings consistent with this opinion.

*REVERSED AND REMANDED*

---

[10]The district court did not reach the consent issue, and we also need not address that issue. The efforts to obtain consent, however, reflect on the reasonableness of the officers' conduct. In any event, consent was unnecessary if the search of the trailer was otherwise permissible.

[11]A warrantless search of the trailer was justified under the vehicular exception to the Fourth Amendment's warrant requirement. *United States v. Gastiaburo*, 16 F.3d 582 (4th Cir. 1994) (observing that warrantless search of immobilized vehicle is constitutional where authorities had probable cause to believe that contraband would be found); *see also California v. Carney*, 471 U.S. 386, 391 (1985) ("Even in cases where an automobile [is] not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justifie[s] application of the vehicular exception.").