**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

In re: MERRY-GO-ROUND
ENTERPRISES, INC.,
                              *Debtor.*

DEBORAH H. DEVAN,
                    *Plaintiff-Appellee,*

v.                                              No. 04-1646

PHOENIX AMERICAN LIFE INSURANCE
COMPANY,
                    *Defendant-Appellant.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(CA-03-3667-JFM; BK-94-50161; AP-97-5480)

Argued: December 2, 2004

Decided: February 23, 2005

Before KING and SHEDD, Circuit Judges,
and Henry F. FLOYD, United States District Judge
for the District of South Carolina,
sitting by designation.

Affirmed by published opinion. Judge King wrote the opinion, in
which Judge Shedd and Judge Floyd joined.

**COUNSEL**

**ARGUED:** Morton Alfred Faller, SHULMAN, ROGERS, GAN-DAL, PORDY & ECKER, P.A., Rockville, Maryland, for Appellant. Cynthia Louise Leppert, NEUBERGER, QUINN, GIELEN, RUBIN & GIBBER, P.A., Baltimore, Maryland, for Appellee. **ON BRIEF:** Stephen A. Metz, SHULMAN, ROGERS, GANDAL, PORDY & ECKER, P.A., Rockville, Maryland, for Appellant. Deborah H. Devan, Jason M. St. John, NEUBERGER, QUINN, GIELEN, RUBIN & GIBBER, P.A., Baltimore, Maryland, for Appellee.

---

**OPINION**

KING, Circuit Judge:

In this appeal by Phoenix American Life Insurance Company ("Phoenix American"), we are called upon to decide whether interest payments made by a debtor on post-petition life insurance policy loans constitute avoidable transfers under § 549(a) of the Bankruptcy Code. Phoenix American maintains that the claim of the Trustee for the estate of debtor Merry-Go-Round Enterprises, Inc. ("MGRE") should have been denied because such interest payments are not, under the statute, avoidable "transfer[s] of property of the estate." 11 U.S.C. § 549(a). In the alternative, Phoenix American asserts that the interest payments made by MGRE were authorized by statute and the bankruptcy court. Both the bankruptcy and district courts disagreed with Phoenix American, ruling that interest payments made to Phoenix American by MGRE on post-petition life insurance policy loans were avoidable transfers. As explained below, we affirm.

I.

A.

In January 1985, MGRE, a retail clothing business operating approximately 1,442 stores nationwide, entered into separate but identical retirement agreements with ten of its executives, providing each of them an annual retirement income of approximately $100,000,

commencing at age 65 (the "Retirement Agreements").[1] On September 1, 1985, MGRE purchased ten identical group life insurance policies from Phoenix American to fund the Retirement Agreements (the "Insurance Policies" or "Policies").[2] The Insurance Policies designated the executives as the insureds and MGRE as sole owner and beneficiary of the policies. Pursuant to the terms of the Insurance Policies, total annual premiums of approximately $191,500 were payable to Phoenix American by MGRE on September 1 of each policy year.

The Insurance Policies also provided that interest on outstanding loans was due and payable on September 1 of each year. If such interest was not timely paid, it was charged as an additional loan against a policy's cash value and added to the policy's loan balance. Finally, the Insurance Policies provided that they would be cancelled if a policy's loan balance exceeded its cash value. In order to pay the annual premiums due in 1986, 1987, and 1988, MGRE obtained loans from Phoenix American on the Insurance Policies — on September 1 of each year — against the accumulated cash values of the Policies, for an outstanding loan principal of approximately $575,000. For each of the years 1989 through 1993, MGRE paid the annual premiums on the Insurance Policies when they were due, plus interest on the outstanding loans. These payments were made by MGRE from its cash flow, without resort to any policy loans.

On January 11, 1994 (the "Commencement Date"), MGRE filed a Chapter 11 bankruptcy petition in the District of Maryland, seeking court protection in the reorganization of its business operations. On the Commencement Date, MGRE filed an "Emergency Motion for Authority to Make Payment in Full of (1) Payroll, (2) Reimbursable Employee Expenses, and (3) Employee Benefits." By this motion, MGRE disclosed the existence of the Insurance Policies, including the annual premiums of approximately $191,500, plus accrued annual

---

[1]We spell out the relevant facts pursuant to the "Joint Stipulation As To Facts" filed by the parties in the bankruptcy court. Joint Stipulation As To Facts, *Devan v. Phoenix Am. Life Ins. Co. (In re Merry-Go-Round Enter.)*, No. 94-5-0161-SD (Bankr. D. Md. Oct. 20, 2003) (the "Joint Stipulation").

[2]The Retirement Agreements had no funding or insurance requirements; MGRE thus had no obligation to purchase the Insurance Policies.

interest of approximately $50,000 on the outstanding loans, due on September 1, 1994. Although the bankruptcy court granted the motion in part, MGRE did not seek, and the court did not award, any relief relating to the Retirement Agreements or the Insurance Policies.

On March 17, 1994, MGRE filed an "Amended Motion to Approve Payment of Certain Prepetition Employee Benefits" (the "Amended Motion"). The Amended Motion stated, in pertinent part, that: "[MGRE] has supplemental retirement agreements with certain executive officers . . . . [A]pproval is sought to maintain and honor these agreements. A list of affected employees, titles, policy numbers and cash values is included . . . ." Amended Motion at ¶ 9. On April 11, 1994, the bankruptcy court ruled on the Amended Motion, entering an order providing that "the debtors shall be permitted to honor and maintain the supplemental retirement agreements described in the [Amended Motion]" (the "April 11, 1994 Order"). No mention was made in the Amended Motion or the April 11, 1994 Order of the outstanding loans against the Insurance Policies.

On November 9, 1994, MGRE directed a request to Phoenix American seeking to "borrow the maximum cash value available" on the Insurance Policies and for Phoenix American to deduct the annual premiums due on September 1, 1994.[3] On December 9, 1994, pursuant to MGRE's request, Phoenix American issued a check to MGRE in the sum of $1,210,752.70 ("Loan I"), representing the maximum loans available to MGRE at that time less the 1994 annual premiums of approximately $191,500 (for the policy year September 1, 1994, through August 31, 1995).

By September 1, 1995, additional cash values had accumulated in the Insurance Policies, but loans totalling $1,976,695.86 remained outstanding.[4] On September 26, 1995, MGRE paid Phoenix American

---

[3]On November 10, 1994, MGRE delivered to Phoenix American a check in the sum of $44,005.74, in full payment of accrued interest due for the 1993 policy year (September 1, 1993, until August 31, 1994) on pre-petition loans.

[4]The $1,976,695.86 in outstanding loans on the Insurance Policies as of September 1, 1995, included:

accrued interest on the outstanding loans in the sum of $134,689.10 ("Interest Payment I") for the preceding policy year (September 1, 1994, through August 31, 1995). That same day, MGRE again directed a request to Phoenix American to "borrow the maximum cash value available" on the Insurance Policies and directed Phoenix American to deduct the annual premiums from the sum to be loaned. Pursuant to MGRE's request, Phoenix American, on October 27, 1995, paid MGRE the sum of $99,875.69 ("Loan II"), representing the maximum loans available at that time less the loans used to pay the 1995 annual premiums of approximately $191,500 (for the policy year September 1, 1995, through August 31, 1996). The approval of the bankruptcy court was neither sought nor obtained for any of the loans made by Phoenix American on the Insurance Policies after the Commencement Date.

On March 1, 1996, the bankruptcy court converted the MGRE bankruptcy case to a Chapter 7 liquidation proceeding and the Trustee was appointed. On October 1, 1996, upon demand of the Trustee that the estate be paid the cash surrender values of the Insurance Policies, Phoenix American issued the Trustee a check for $810.63. This sum represented (1) the total cash values of the Insurance Policies ($2,438,695.29), (2) minus the outstanding loans ($2,268,057.34),[5]

- pre-petition loans, totalling $574,457.37;

- loans used to pay the September 1, 1994 policy premiums, totalling $191,485.79; and

- Loan I ($1,210,752.70).

[5]The $2,268,057.34 in outstanding loans on the Insurance Policies as of September 1, 1996, included:

- $1,976,695.86 in outstanding loans as of September 1, 1995;

- loans used to pay the September 1, 1995 policy premiums, totalling $191,485.79; and

- Loan II ($99,875.69).

and (3) minus accrued interest on the outstanding loans for the preceding policy year (September 1, 1995, through August 31, 1996) of $169,827.32 ("Interest Payment II").

B.

On September 2, 1997, the Trustee initiated an adversary proceeding against Phoenix American in the bankruptcy court seeking to recover the sum of $1,616,144.81 for the loans Phoenix American had made on the Insurance Policies after the Commencement Date, *i.e.*, Loans I and II (collectively, the "Loans"), and the two interest payments made by MGRE on those loans, *i.e.*, Interest Payments I and II. The Trustee contended that the Loans and Interest Payments I and II were unauthorized post-petition transfers under 11 U.S.C. § 549, which provides, in relevant part, that "the trustee may avoid a transfer of property of the estate . . . that occurs after commencement of the case . . . [and] that is not authorized under this title or by the court." 11 U.S.C. § 549(a)(2)(B) (the "Statute"). On March 31, 1999, after the parties filed cross-motions for summary judgment, the bankruptcy court granted summary judgment to Phoenix American with respect to the Trustee's claims on the Loans. However, the court denied any relief to Phoenix American with respect to Interest Payments I and II, concluding that they may have constituted unauthorized post-petition transfers under the Statute, and preserving that issue for trial. *Devan v. Phoenix Am. Life Ins. Co. (In re Merry-Go-Round Enter., Inc.)*, No. 94-5-0161-SD, slip op. at 6-9 (Bankr. D. Md. Mar. 31, 1999) (granting in part and denying in part motion for summary judgment) ("Bankr. Op. I").

On September 12, 2003, the parties filed renewed motions for summary judgment on the Trustee's claims relating to Interest Payments I and II, and the parties agreed that these motions should be heard together at the bench trial scheduled for November 3, 2003. In connection with the summary judgment motions and the upcoming trial, the parties, on October 20, 2003, filed the Joint Stipulation with multiple exhibits. The court thereafter conducted the bench trial and rendered an oral opinion in favor of the Trustee on Interest Payments I and II. *Devan v. Phoenix Am. Life Ins. Co. (In re Merry-Go-Round Enter., Inc.)*, Tr. of Judge's Decision Only, No. 94-5-0161-SD (Bankr. D. Md. Nov. 3, 2003) ("Bankr. Op. II"). Pursuant thereto, on

November 24, 2003, the court entered judgment against Phoenix American in the sum of $214,211.72, plus pre-judgment interest from August 29, 1997. The court determined the amount of the judgment by aggregating Interest Payment I ($135,689.10) with Interest Payment II ($169,826.32), and then deducting $90,294.70 for interest paid on pre-petition loans. (We hereinafter refer to the judgment sum of $214,211.72 as the "Interest Payments."). In so doing, the court concluded that MGRE was authorized by its April 11, 1994 Order to make the interest payments on pre-petition loans.

Phoenix American appealed the judgment to the district court and, on April 12, 2004, the district court affirmed the bankruptcy court's ruling. *Phoenix Am. Life Ins. Co. v. Devan*, 308 B.R. 237, 243 (D. Md. 2004) ("Dist. Op."). The district court held that the Interest Payments constituted "transfers" within the meaning of the Statute, and that they were not authorized by the Bankruptcy Code or the bankruptcy court. Phoenix American has now appealed the district court's ruling to this Court, and we possess jurisdiction pursuant to 28 U.S.C. § 158(d).

II.

We review the judgment of a district court sitting in review of a bankruptcy court de novo, applying the same standards of review that were applied in the district court. *Three Sisters Partners, L.L.C. v. Harden (In re Shangra-La, Inc.)*, 167 F.3d 843, 847 (4th Cir. 1999). Specifically, "we review the bankruptcy court's factual findings for clear error, while we review questions of law de novo." *Loudon Leasing Dev. Co. v. Ford Motor Credit Co. (In re K & L Lakeland, Inc.)*, 128 F.3d 203, 206 (4th Cir. 1997).

III.

As recognized by the bankruptcy and district courts, the recovery by a Trustee of post-petition transfers from the bankruptcy estate requires, under the Statute, the satisfaction of four elements: (1) a transfer, (2) of property of the estate, (3) made after commencement of the case, and (4) that is not authorized under the Bankruptcy Code or by the bankruptcy court. *See Hoagland v. Edward Hines Lumber Co. (In re LWMcK Corp.)*, 196 B.R. 421, 423 (Bankr. S.D. Ill. 1996);

*Geekie v. Watson (In re Watson)*, 65 B.R. 9, 11 (Bankr. C.D. Ill. 1986). On appeal, Phoenix American maintains that the Interest Payments do not constitute "transfer[s]" within the meaning of the Statute and, alternatively, that they were transfers authorized by the Bankruptcy Code and the bankruptcy court. We address these contentions in turn.

A.

Phoenix American first asserts that both of the lower courts erred in determining that the Interest Payments were "transfer[s]" under the Statute. Under the Bankruptcy Code, a "transfer" is defined broadly as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property." 11 U.S.C. § 101(54). Phoenix American maintains that the Interest Payments do not constitute such transfers, in that they did not dispose of or part with MGRE's property. First, it contends, the bankruptcy court properly found that the Loans were not "transfer[s]" under the Statute because they simply delivered MGRE's own funds to itself. Bankr. Op. I at 6-9 ("The so-called policy loan is in actuality only an advance to the policyholder of reserve values in the policy to which the policyholder is absolutely entitled . . . ."); *see also Bd. of Assessors of the Parish of Orleans v. N.Y. Life Ins. Co.*, 216 U.S. 517, 522-23 (1910) (Holmes, J.) (holding that policy loans are distinct from ordinary loans because there is no obligation to repay). Phoenix American maintains, however, that the bankruptcy court erred when it distinguished the Loans from the Interest Payments. According to Phoenix American, because the Interest Payments prevented the cash surrender values of the Insurance Policies from being reduced, they did not dispose of or part with MGRE's property; to the contrary, those Payments increased the cash surrender values of the Policies. Under Phoenix American's reasoning, the Interest Payments are not "transfer[s]" within the meaning of the Statute.

We see this contention as without merit, and we agree with the bankruptcy and district courts that the Interest Payments constituted "transfer[s]" under the Statute. The bankruptcy court persuasively reasoned that the Interest Payments were "payment[s] to [Phoenix American] to maintain [Phoenix American's] investment return on the life

insurance policies' cash values to enable [Phoenix American] to pay policy dividends and *to earn a return for itself*." Bankr. Op. I at 10 (emphasis added). MGRE thus depleted its assets, *i.e.*, the cash surrender values of the Insurance Policies, in order to make interest payments to Phoenix American. This is different, the bankruptcy court recognized, from the Loans, where MGRE merely withdrew the cash values it owned in the Policies. In these circumstances, the Interest Payments constituted "transfer[s]" under the Statute, because they decreased the value of MGRE's estate by disposing of the estate's property in favor of Phoenix American.

## B.

Alternatively, Phoenix American contends that MGRE was authorized to make the Interest Payments by both the Bankruptcy Code, specifically § 365 (executory contracts) and § 363(c)(1) (ordinary course of business transactions), and by the bankruptcy court in its April 11, 1994 Order. On this point, we first observe that Phoenix American bore the burden of proving that the transfers were "authorized." *See* Fed. R. Bankr. P. 6001 ("Any entity asserting the validity of a transfer under [the Statute] shall have the burden of proof."). We consider in turn Phoenix American's alternate assertions that the transfers, *i.e.*, the Interest Payments, were authorized by the Bankruptcy Code and the bankruptcy court.

## 1.

### a.

Phoenix American contends that the Insurance Policies were "executory contracts" within the meaning of § 365, which gives a Chapter 11 debtor the authority, subject to court approval, to "assume or reject" any executory contract of the debtor. 11 U.S.C. § 365. Importantly, Phoenix American concedes that MGRE did not seek bankruptcy court approval prior to MGRE's purported assumption of the Insurance Policies. Appellee's Br. at 27. Therefore, Phoenix American's contention on this point must fail, as it did in the district and bankruptcy courts, for the simple reason that MGRE did not obtain court approval of MGRE's alleged contract assumptions, as mandated by § 365. *See* Dist. Op. at 242; Bankr. Op. II at 8; *see also In re A.H.*

*Robins Co.*, 68 B.R. 705, 711 (Bankr. E.D. Va. 1986) ("[C]ourt approval is not a perfunctory step and assumption by conduct cannot be sanctioned by this Court.").

b.

Next, Phoenix American maintains that the Interest Payments were authorized by § 363(c)(1), as payments made "in the ordinary course of business," and thus should not have been avoided under the Statute. 11 U.S.C. § 363(c)(1).[6] Phoenix American asserts that MGRE made the Interest Payments to maintain the Insurance Policies for the purpose of funding, in the ordinary course of its business, the benefits due to its executives under the Retirement Agreements. Both lower courts disagreed with this contention, however, finding that the Interest Payments failed to qualify as being made "in the ordinary course" of MGRE's business under § 363(c)(1). Because the bankruptcy court resolved the "ordinary course" issue by a factual determination, we may set it aside only if it is clearly erroneous. *Harman v. First Am. Bank of Md. (In re Jeffrey Bigelow Design Group, Inc.)*, 956 F.2d 479, 481-82 (4th Cir. 1992); *see also United States v. Singh*, 363 F.3d 347, 354 (4th Cir. 2004) ("A factual finding is clearly erroneous when, through our review of the evidence, we are left with the definite and firm conviction that a mistake has been committed."). And because, on careful consideration, we are left with no firm conviction that a mistake has been committed here, we are unable to identify clear error in this finding.

In resolving this contention, we are content to adopt the reasoning of the district court, that is, that Phoenix American failed to carry its burden of proving that the Interest Payments qualified as "ordinary course of business" transactions. *See* Dist. Op. at 241; *see also* Fed. R. Bankr. P. 6001. Phoenix American presented no evidence either that (1) obtaining life insurance policy loans in the maximum allowable sum were common practice in its industry, *i.e.*, the operation of

---

[6]Although § 363 speaks only of the authority of a trustee, 11 U.S.C. § 1107 grants a debtor-in-possession — MGRE during its initial Chapter 11 proceeding — the rights of a trustee (with some exceptions which are not relevant here). *See In re Roth Am., Inc.*, 975 F.2d 949, 952 n.2 (3d Cir. 1992).

retail clothing stores; or (2) a creditor would reasonably have expected MGRE to enter into such loans. *See* Joint Stipulation; *see also Bowers v. Atlanta Motor Speedway, Inc. (In re S.E. Hotel Props. Ltd. P'ship)*, 99 F.3d 151, 158 (4th Cir. 1996) (rejecting debtor's contention that transactions were in "ordinary course of business" because debtor failed to show they were common practice in industry or that creditors could reasonably expect them). We therefore reject Phoenix American's contention that the Interest Payments were authorized under the provisions of § 363(c)(1).

2.

Finally, Phoenix American maintains that the Interest Payments were authorized by the April 11, 1994 Order, permitting MGRE to "honor and maintain the supplemental retirement agreements" as described in the Amended Motion. MGRE's Amended Motion had represented to the bankruptcy court that the Retirement Agreements (referred to in the April 11, 1994 Order as "the supplemental retirement agreements") were funded by the Insurance Policies.[7] Phoenix American contends on appeal that the bankruptcy court's April 11, 1994 Order authorized MGRE to borrow against the cash values of the Insurance Policies and that the Interest Payments were merely a cost of honoring and maintaining those Policies (and the Retirement Agreements).

Phoenix American's contention on the April 11, 1994 Order is without merit for two reasons. First, the Amended Motion merely sought authority to honor and maintain the Retirement Agreements, and the April 11, 1994 Order does not mention the Insurance Policies in any way, much less authorize MGRE to deplete their cash values. Second, the bankruptcy court interpreted its April 11, 1994 Order as *not* authorizing the Interest Payments. Bankr. Op. II at 6 ("I think [the April 11, 1994 Order] simply does not go that far to say a paragraph offering a debtor to maintain supplemental retirement agreements extends to allowing the debtor to use those insurance contracts for

---

[7]The Amended Motion provided, in pertinent part, that "[MGRE] has obtained life insurance on each officer to fund benefits payable under the agreements. . . . [A]pproval is sought to maintain and honor these agreements." Amended Motion at ¶ 9.

other purposes."). And when this issue was raised on appeal to the district court, that court aptly observed, "[a] bankruptcy court is deemed to be in the best position to interpret its own orders, and thus a court's interpretation of its own order must be given substantial deference." Dist. Op. at 242 (relying on *Colonial Auto Ctr. v. Tomlin (In re Tomlin)*, 105 F.3d 933, 941 (4th Cir. 1996)).

Phoenix American also asserts that, because the bankruptcy court deemed interest payments on pre-petition loans as authorized by its April 11, 1994 Order, the Interest Payments themselves must also have been authorized. *See supra* Part I.B; *see also* Bankr. Op. II at 9-10 ("I do draw a distinction here as a matter of fact between the post petition loan and the policy loan interest being made on that . . . and the pre-petition policy loan obligations that were paid post-petition."). In its emergency motion filed on the Commencement Date, MGRE disclosed to the bankruptcy court that it would be required to make interest payments on pre-petition loans of approximately $50,000, but the post-petition interest payments were in fact nearly three times that sum. In that circumstance, we see no error in the bankruptcy court's finding that the Interest Payments (for loans obtained post-petition) were not authorized by the April 11, 1994 Order, which merely permitted "honoring and *maintaining*" the Retirement Agreements (not the withdrawal of an unprecedented $1.3 million from the Insurance Policies). Furthermore, as we have observed, a bankruptcy court is in the "best position to interpret its own orders." *Colonial Auto Ctr.*, 105 F.3d at 941. According the appropriate deference to that court's interpretation of its April 11, 1994 Order, the Interest Payments were not authorized by the bankruptcy court. Therefore, the Interest Payments were neither authorized by the Bankruptcy Code nor the bankruptcy court.

IV.

Pursuant to the foregoing, we affirm the judgment of the district court.

*AFFIRMED*